Robert RYNAR, Plaintiff,

v.

CIBA–GEIGY CORPORATION, Defendant.

No. 82 C 2866.

United States District Court, N.D. Illinois, E.D.

March 30, 1983.

Leonard S. Goslawski, Lewis, Overbeck & Furman, Chicago, Ill., for plaintiff.

Charles B. Wolf, Barbara J. Stob, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

WILL, District Judge.

Robert Rynar, a former employee of the defendant Ciba-Geigy Corporation (Ciba), alleges that Ciba owes him $23,375.04 in severance pay and other benefits[1] as a re-

sult of Ciba's termination of his employment. Our jurisdiction is based upon diversity of citizenship. In an earlier memorandum opinion, we denied Ciba's motion to dismiss Rynar's complaint. Following discovery (including the taking of Rynar's deposition), Ciba brings this motion for summary judgment. (After the announcement of this opinion, we granted Rynar leave to add a second count, based on the Employee Retirement Income Security Act of 1974, as amended. Rynar's ERISA count is not a subject of Ciba's current motion, and therefore is not addressed in this opinion.) For the reasons stated below, we grant that motion.

### I.

The following facts are not in dispute. Rynar was employed by the Communication Equipment and Engineering Company (CEECO) from October 12, 1964 until October 1, 1978, when REN Plastics (REN), which was owned by Ciba, purchased CEECO. (Pl.Dep. at 20, 28, 33) Rynar accepted Ciba's offer (made by Richard B. Peterson, General Manager of REN) to continue in his job as site manager for the Melrose Park, Illinois, and Lancaster, Wisconsin, facilities formerly owned by CEECO. (Pl. Dep. at 38, 41)

Rynar did not enter into a written contract with either REN or Ciba at any time. (See Pl.Dep. at 42, 60) Nor did he receive an employee handbook at any time. (Pl. Dep. at 104–05) Both Rynar and Peterson recall discussing Rynar's working for REN, but neither can recall discussing the specific subject of severance pay before Rynar's acceptance of Peterson's offer. (Pl.Dep. at 39–45; Peterson Aff. at ¶¶ 12 and 13) Within a short time after becoming an employee of REN, Rynar discussed benefits with REN's personnel manager, Loretta Denfield. (Pl.Dep. at 39–45) Denfield told Rynar that REN tended to honor CEECO

---

1. Rynar's claim is for severance pay, pay in lieu of notice, and unused vacation pay, all of which totals $23,375.04. Rynar now admits, however, that he received all the vacation pay which was due him. (See Pl.Dep. at 82–83, 163) Even with a reduction in Rynar's claim to reflect his receipt of his unused vacation pay, Rynar's claim remains in excess of $10,000.00. See Ex. 4 to Appendix to Defendant's Motion.

service for purposes of computing vacation benefits and that employees would be entitled to receive two weeks' pay in lieu of notice upon termination. (Pl.Dep. at 45–48) Regarding severance pay, Rynar recalls that Denfield told him only "that it was available as one of the benefits" but did not discuss with him the qualifications or formula for receiving it. (Pl.Dep. at 50–51) After these conversations with Denfield in 1978, Rynar was not told of any change in these benefits programs. (Pl.Dep. at 108)

In April of 1979, Denfield sent Rynar a copy of Ciba's severance policy because he would be responsible for administering it with respect to the closing of the Melrose Park facility. (Pl.Dep. at 120; Dep.Ex. 1) This policy had been in effect since June 6, 1972. (Dep.Ex. 1) It was revised effective March 15, 1981, in minor and immaterial respects.[2] Although Rynar read the policy, he does not recall discussing it with Denfield or anyone else. (Pl.Dep. at 122–23) Rynar knew that the policy was part of a larger "personnel policy manual" but he never had or read any other part of that manual. (Pl.Dep. at 139) After the Melrose Park plant was closed in September of 1979, Rynar continued with Ciba in various other positions. (Pl.Dep. at 51–59)

The portion of Ciba's 1981 personnel policy manual which sets forth Ciba's policies regarding "termination" of employees recognizes various ways in which employment might end. The policy distinguishes among and defines seven kinds of "termination" (resignation, separation for reasons other than cause, separation for cause, discharge, normal retirement, early retirement, and disability retirement), and states that "[a]ll terminations of employment from CIBA–GEIGY Corporation shall be classified" under one of those seven labels. Section 1.2 of the policy defines "separation for reasons other than cause" as:

> Initiated by the Company for reasons beyond the control of the employee (e.g., reorganization, budgetary cutback, lack

of work, relocation of work station beyond normal commuting range).

In section 2.5 (and its subsections), Ciba's personnel policy provides for severance pay:

> 2.5 *Severance Pay*
>
>   \*    \*    \*    \*    \*    \*
>
> 2.5.1 In appropriate cases ... terminating employees with a minimum of one year of permanent, full-time service shall be eligible for severance benefits as follows:
>
>   \*    \*    \*    \*    \*    \*
>
> 2.5.1.2 *Separation for Reasons Other Than Cause*
>
> Two weeks' pay for each year of Company service: maximum payment —52 weeks. (*Note:* See paragraphs 2.5.4 and 2.5.6)

Section 2.5.4 of the policy provides that

> [i]f an employee scheduled to be separated for reasons other than cause is offered a comparable position with CIBA–GEIGY Corporation and declines the offer, the severance pay will be reduced by one-half. If, however, the employee would be required to relocate in order to accept the position and chooses not to do so, there would be no reduction in severance pay.

The policy defines "comparable position," for the purpose of section 2.5.4 as "a position at the same or higher Hay [pay?] point or salary grade level with no reduction in salary." Section 2.5.6.

Finally, section 2.9.2 of the policy provides that

> [t]his policy shall not be applicable in any special situation (such as the relocation of a major Operating Unit) where the Corporate Management Committee deems it necessary to establish a separate policy applicable to that situation only.

In November or December of 1980, Rynar received through the mail a certificate of service, attached to his Complaint as Exhibit B. (Pl.Dep. at 128–29) The certificate bears the name "CIBA–GEIGY" in bold

---

2. The revised version, from which we have quoted below, is attached to Rynar's Complaint as Exhibit A. The 1972 version of Ciba's policy is contained in the Appendix to Ciba's motion as Exhibit 1.

print along one margin and states: "Robert Rynar has completed 15 years of employment in this Company. In recognition of faithful and loyal service, this Certificate is awarded." The certificate was signed by Peterson (General Manager of REN) over the title "Site Manager." (Peterson Aff. at ¶ 8; *see* Exhibit B to Complaint) No letter accompanied the certificate, but Rynar discussed the certificate with Andy Anderson and Hugh Allen, two of his supervisors. (Pl.Dep. at 129–30, 145–46) Rynar asked Anderson on one occasion whether the certificate meant that "Ciba has bridged our seniority for severance purposes." Anderson replied, "It looks like it." (Pl.Dep. at 130)

Rynar's discussion with Hugh Allen occurred later, when Rynar became aware that Ciba was selling REN. At that time, Rynar was unsure whether his employment with Ciba would continue after the sale and expressed his concern to Allen. Allen told him, "You have got a CIBA certificate.... If they recognize your time ... you have got a full house if you were playing poker." (Pl.Dep. at 146–48)

Rynar also talked with other Ciba employees who had come to Ciba from CEECO, but none of them had any specific and definitive information as to the meaning of the certificate. (Pl.Dep. at 133–38) Rynar did not ask personnel officials of either REN or Ciba what the certificate meant regarding his eligibility for severance benefits if he lost his job. Nor did he inquire of officials higher than his own supervisors, Allen and Anderson, how his length of service would be computed for the purpose of severance pay.

Ciba claims that its certificates to employees were merely part of an employee relations program and had no particular significance:

> Defendant included service with predecessor companies which it had acquired for certain limited purposes, i.e., its service awards program and vacation entitlement. The service awards treatment originated in Glens Falls, New York, as a continuation of a program originated by such a predecessor company, to build employee morale at a modest cost. It was recognized that the program could not be continued effectively without taking predecessor service into account. The program was then extended to other groups at CIBA–GEIGY on the same basis.

Defendant's Answers to Plaintiff's Interrogatories, No. 13, *reprinted in* Defendant's Reply Memorandum at 7; *see also* Defendant's Initial Memorandum at 15 n. 8.

In addition to his certificate of service, Rynar notes that some of the data on a form labelled "Personnel Profile" refers to time when he was employed by CEECO. For example, this form lists Rynar's "Date of Employment" as 10/27/78, but then lists his "Original Hire Date" as 10/12/64. Additionally, a box marked "YRS. CSVC." (apparently, years of credited service) indicates that Rynar had 18 years of credited service. *See* Exhibit 5 to Plaintiff's Memorandum.

Rynar was aware of the reference, in section 2.9.2 of the severance policy to "any special situation," but had no discussion about it with anyone at Ciba. (Pl.Dep. at 143) Rynar also testified that it was his understanding that Ciba reserved the right to change the policy at any time.[3] (Pl.Dep. at 199)

During the summer of 1981, a portion of the REN operation was sold to Charles Industries and another portion was sold to Communications Technology Corporation (CTC). (*See* Pl.Dep. at 72–73) On July 28, 1981, Rynar was informed by Stan Kase that Rynar's employment with Ciba was terminated immediately. Although none of the documents brought to our attention specifically classifies Rynar's termination as "for reasons other than cause," Ciba does not object to Rynar's claim that that is the appropriate classification, under Ciba's personnel policy, of Rynar's termination of employment.

---

**3.** However, nothing in the severance policy indicates that Ciba reserved the right to change its provisions unilaterally (in the absence of a § 2.9.2 "special situation").

Kase told Rynar that he was entitled to unused vacation pay, which Rynar later received. (Pl.Dep. at 82–83, 163) Kase also told Rynar that he would receive $3,167.79 in severance pay and $1,578.31 in pay in lieu of notice if he was not employed by Charles Industries. (Pl.Dep. at 163–65; see Dep.Ex. 4) Rynar responded to Kase that for Ciba not to base severance pay and pay in lieu of notice upon Rynar's time with CEECO in addition to his time with REN was arbitrary and capricious. (Pl.Dep. at 83) Rynar apparently did not respond to Kase that he regarded Ciba's conditioning of any severance pay upon the failure of Charles Industries to offer Rynar his old position as similarly arbitrary or as not in accordance with Ciba's personnel policies. A letter, dated August 4, 1981, and written by Joan Velba, Ciba's Manager for "Employment and EEO," confirmed Kase's statement that Rynar would be eligible for severance pay totaling $3,167.79 and $1,578.31 in pay in lieu of notice if Charles Industries did not offer to keep him on in his old position.

The next day, July 29, 1981, Rynar telephoned Joe Charles, the president of Charles Industries, with whom he had talked previously while escorting Charles on a tour of the Lancaster, Wisconsin plant before Charles' purchase of that part of REN. Charles offered Rynar a position as sales manager for Charles Industries at a base salary of $26,000 per year plus the use of a company car, an offer which Rynar considered "almost an equivalency" to his salary at Ciba of $29,000. (Pl.Dep. at 85, 88) Rynar accepted and began working for Charles Industries the same day. (Pl.Dep. at 104, 181) According to Rynar, he did not know, prior to July 29, whether he would continue to be employed by Charles Industries after the sale. (Pl.Dep. at 81) Although the purchase agreement between Ciba and Charles Industries contains the buyer's agreement to offer employment to twenty-one of Ciba's employees, one of whom was Rynar, as a condition of the sale (Purchase Agreement ¶ 14, Ex. G to Appendix to Defendant's Motion), Ciba does not contradict Rynar's statement that he was not informed (by Kase or anyone else at Ciba) of the agreement by Charles Industries to offer him and others employment. Apart from this provision in the purchase agreement, no "separate policy" (see section 2.9.2 of Ciba's termination policy) applicable to Ciba's sale of REN to Charles Industries, promulgated as a substitute for Ciba's general policy regarding terminations, has been brought to our attention.

During Rynar's employment with Ciba, he did not seek and was not offered employment by any other company except Comtech, a telecommunications company. (Pl. Dep. at 90–91, 98) Comtech approached Rynar twice through Bill Feahr, a consultant for Comtech (Pl.Dep. at 92–95) who had hired Rynar for CEECO in 1964. Rynar did not discuss "specifics," such as salary, with Feahr, and stated that he was not interested in leaving Ciba to work for Comtech because he thought Ciba "was a fine company" and did not want to work for a competitor. (Pl.Dep. at 92–94) In this respect, Rynar testified that he liked the people at Ciba, felt he had a good future with the company and liked its benefits programs, particularly the pension, investment savings and group insurance programs. (Pl.Dep. at 102–04) Rynar also testified that if he had accepted Comtech's offers, he would have been required to relocate or commute over 100 miles each day. (Pl.Dep. at 93)

In at least one instance, an employee of Ciba has received severance pay erroneously or in a manner contrary to Ciba's personnel policies. Ronald Woycek, whose job at Ciba's Lancaster plant was ended "for cause," received severance pay based upon the date he was hired by an earlier employer rather than upon the date that Ciba became his employer. See Exhibits 3 and 4 to Plaintiff's Memorandum.

## II.

The matters which are in dispute are whether, under Illinois law, Ciba's personnel policy regarding terminations is part of the employment contract which governs the employer-employee relationship, and, if that policy has contractual status, the effect of

the policy upon the particular facts on which Ciba and Rynar agree.

■ Under Illinois law, an employment relationship implies the existence of an employment contract. *See Sargent v. Illinois Institute of Technology,* 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1st Dist. 1979); *Bartinikas v. Clarklift of Chicago North, Inc.,* 508 F.Supp. 959 (N.D.Ill.1981). An employment contract, whether oral or written, which does not specify a time period is an "at will" employment contract and may be terminated by either employer or employee for or without cause. *Sargent,* 33 Ill.Dec. at 939, 397 N.E.2d at 445; *Goodman v. Board of Trustees of Comm. College District 524,* 511 F.Supp. 602, 606 (N.D.Ill. 1981). Thus, Rynar's failure to allege the existence of a written contract is not necessarily detrimental to his claim, for Illinois recognizes that an oral contract may govern such a relationship. The preliminary inquiry in this case must therefore be whether the parties altered the "at will" nature of that employment contract, specifically whether Ciba's personnel policy regarding termination of employees is or became part of an existing oral employment contract with Rynar.

■ As we noted in our earlier memorandum opinion in this case, the general rule in Illinois is that a personnel policy manual is not a part of the employment contract if it was not bargained for but was merely given to an employee when he began his employment. *Sargent,* 78 Ill.App. at 121–22, 33 Ill.Dec. 937, 397 N.E.2d 443. Although a sophisticated employer will expect the promulgation of certain policies and practices to enhance employees' morale, *see Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880, 892 (1980), Illinois appears to adhere to the view that a personnel policy can be a gratuity and can be worded so as to give the employer an unfettered right to change or discontinue its policy's provisions at any time. *See Sargent,* 33 Ill.Dec. at 938, 397 N.E.2d at 446; *Hughes v. Encyclopedia Britannica, Inc.,* 1 Ill.App.2d 514, 117 N.E.2d 880, 881 (1954).

■ As indicated in our earlier opinion, Illinois recognizes two exceptions to this general rule. The first is where another document exists which can be construed as an express employment contract, and where that contract can be construed as subject to the "policies" of the employer. There, the personnel policy will be deemed incorporated into the contract. *Piper v. Board of Trustees of Comm. College District No. 514,* 99 Ill.App.3d 752, 55 Ill.Dec. 287, 292, 426 N.E.2d 262, 267 (3d Dist.1981). As indicated, the employment contract in this case is oral, and the incorporation argument of *Piper* is therefore not available. Although Rynar's deposition statement that—shortly after Ciba and REN became his employers in place of CEECO—Denfield told him that severance pay "was available" suggests an incorporation argument analogous to the *Piper* exception, such a broadening of the *Piper* exception would eliminate the general rule. Under *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), such developments of state law are to be left to the state courts and legislature even if we regard other reasoning (*e.g.,* that of *Toussaint, supra*) as more persuasive.

■ The second exception to the general rule arises where the terms of the policy itself suggest that a mutuality of obligation was intended by employer and employees when the policy was written, *Carter v. Kaskaskia Community Action Agency,* 24 Ill. App.3d 1056, 322 N.E.2d 574, 576 (1974), and the facts surrounding implementation of the policy establish that the policy modified the pre-existing employment contract which is implied in the employer-employee relationship. *Scutt v. LaSalle County Board,* 97 Ill.App.3d 181, 53 Ill.Dec. 21, 24–25, 423 N.E.2d 213, 216–17 (3d Dist.1981); *see Carter,* 322 N.E.2d at 576. In *Carter,* the court inferred a mutuality of obligation from provisions in a personnel policy which gave employees grievance procedures but which stated that employees would lose their rights to accrued vacation pay if they failed to give 30 days' notice before resigning. 322 N.E.2d at 576.

The court also noted that the personnel policy manual was adopted after the plaintiffs were hired, and that the employer had reviewed the manual with the employees, who then accepted it. *Id.* The court concluded that the manual was a proposed modification (giving the employee the right to a grievance hearing before discharge in exchange for forfeiture of vacation pay if 30 days' notice was not given prior to resigning) of an existing (but unwritten) "at will" employment contract, that both employer and employees accepted the modification, and that the employees' continuing to work after the modification also constituted both assent to and consideration for the modification of the existing contract. *Id. Carter,* therefore, does not support the proposition that merely continuing to work after the inception of a personnel policy is consideration for the policy and renders the policy part of the employment contract. *See Sargent,* 33 Ill.Dec. 940, 397 N.E.2d at 446; *Medtronic, Inc. v. Benda,* 689 F.2d 645, 654 (7th Cir.1982) (district court opinion (Decker, J.) adopted by the Seventh Circuit); *see also Scutt,* 53 Ill.Dec. at 25, 423 N.E.2d at 217 (employer's announcement of $1000 raise was a modification of an "at will" employment contract, and employees' continuing to work constituted assent to and consideration for the modification).

■ Upon rereading the terms of Ciba's policy, we conclude that those terms do suggest a *mutuality of obligation* (from which a "mutuality of consideration" might be inferred) similar to that inferred from the personnel policy at issue in *Carter, supra.* Section 2.5 (and its subsections) of Ciba's policy provide for "severance pay" to employees whose employment is ended by Ciba "for reasons other than cause." A lesser amount of severance pay is provided to employees whose employment is ended "for cause," but no severance pay is provided to those employees who resign or who are "discharged." In our earlier opinion, we noted that the Ciba policy's provision regarding an employee's notice of resignation states merely that "[a] letter of resignation submitted at least two weeks in advance is customary and is expected," Ciba

Personnel Policy at § 2.1.1.1, but we stated incorrectly that no section of that policy appears to place on its employees any countervailing burden. Section 2.1.1.1 continues, and states that "[f]ailure to comply [with the "customary" two week notice in advance of resignation] may, at the discretion of Operating Unit management, result in forfeiture of unused vacation allowances."

Unlike the situation presented in *Carter,* however, the undisputed facts, as adduced during Rynar's deposition, do not suggest that either Rynar individually or Ciba's employees collectively accepted this personnel policy as a contract. Rynar was not given a copy of the policies regarding termination of employees until several months after Ciba became his employer, and he was not informed orally of the policy's provisions (except to the extent that severance pay was "available" before becoming an employee of Ciba. Rynar eventually received a copy of the termination policy so that he could implement it in connection with the closing of Ciba's Melrose Park plant in 1979. That context does not suggest an offer of any benefit to Rynar in return for either Rynar's continued employment or any other benefit to Ciba. Although Ciba modified its policies in March of 1981, none of the changes were material; neither the changes nor the new document as a whole were presented to Ciba's employees for their review and approval, in contrast to the facts of *Carter.* In some jurisdictions, the existence of a personnel policy and employees' general awareness that the policy provides certain benefits are enough to make the policy part of the employment contract. *See, e.g., Hinkeldey v. Cities Service Oil Co.,* 470 S.W.2d 494, 501 (Mo.1971). But the Illinois rule is otherwise, and we therefore conclude that Ciba's personnel policy concerning termination of employment was not part of the employment contract which governed its behavior toward its employees.

■ That Ciba's personnel policy manual does not have contractual status does not exclude the possibility that Rynar might

prevail upon an argument based on the doctrine of promissory estoppel. To prevail upon a promissory estoppel theory, a plaintiff must establish that (1) there was a promise unambiguous in its terms made to him; (2) he relied on that promise; (3) this reliance was expected and foreseeable; and (4) he was injured as a result of reliance on that promise. *S.M. Wilson & Co. v. Prepakt Concrete Co.,* 23 Ill.App.3d 137, 318 N.E.2d 722, 724 (5th Dist.1974).

■ We cannot conclude, on the basis of the undisputed facts set forth above, that Ciba's promise to provide severance pay to employees whose jobs were ended for certain reasons unambiguously includes Rynar's case within its scope. Neither Rynar nor anyone else recalls a specific discussion of severance pay before Rynar was hired by REN. According to Rynar, Denfield later told him that severance pay was "available," but that is considerably less than an unambiguous explanation of the criteria for severance pay or the circumstances under which that benefit is available. The written policy itself contains some phrases which at least appear to hedge the availability of severance pay in ambiguous ways. First, section 2.5.2 states that provisions regarding severance pay are applicable "[i]n appropriate cases."

Second, the statement in section 2.9.2 that "[t]his policy shall not be applicable in any special situation (such as the relocation of a major Operating Unit) where the Corporate Management Committee deems it necessary to establish a separate policy applicable to that situation only," suggests the possibility that terminations resulting from the sale of a division might not be eligible for the same package of benefits available in ordinary, isolated job terminations. Nor does the certificate which Rynar received from Ciba, recognizing that Rynar "has completed 15 years of employment in this Company," constitute an unambiguous assurance of Rynar's eligibility for severance pay based on 15 years service under the

facts of this case. The certificate itself does not mention severance pay or eligibility for benefits from Ciba, and no letter or verbal explanation of the significance of the certificate accompanied that document.

Similarly, that some of the data on Rynar's "Personnel Profile" refers to his employment by CEECO or gives him credit for his employment by CEECO does not establish an unambiguous promise that Rynar would be eligible for severance pay. Ciba's recording of that information does not establish that Ciba recognized Rynar's CEECO time for all purposes. Finally, Ciba's grant of severance pay to Woycek in circumstances inconsistent with its policies does not establish an unambiguous promise not to adhere to its policies in the future or to be as generous to other employees.

Even assuming an unambiguous promise of eligibility for severance pay, Rynar does not appear to have relied on that promise. While employed by Ciba, Rynar declined job offers from Comtech, but his own explanation for doing so did not mention severance pay available from Ciba as a reason for staying at Ciba. Furthermore, assuming reliance, we can hardly say that Rynar was injured when he received or obtained a job from the buyer of REN the day after he was informed that his employment with Ciba was ended, and when Rynar regarded his position with the new employer as "almost an equivalency" of his position with his former employer.[4]

In our earlier opinion, we remarked that while Rynar's complaint was sufficient to survive a motion to dismiss, the wording of the allegations contained in that complaint (in light of Ciba's contention at that time that Rynar's employment was never terminated by Ciba at all because Rynar continued to work for the company which purchased REN from Ciba) gave rise to a reasonable inference that discovery would reveal Rynar's action to be a nuisance suit. Our review, incident to deciding this present motion, of the record as amplified

4. Given Rynar's obligation to establish all elements of a promissory estoppel theory and his failure to establish any of the three which we have examined, it is unnecessary to discuss the fourth element, whether reliance, if it occurred, was expected and foreseeable.

by discovery convinces us that this is not the case. Given the poor draftsmanship of Ciba's personnel policies, Ciba's haphazard communication of those policies to its employees, and Ciba's inconsistent application of those policies to the employees whose jobs were ended, it is fair to say that Ciba was inviting a lawsuit over the nature and application of those policies. On the other hand, as we have found, Rynar had no contractual right to severance pay, he did not rely to his detriment on any such right, he continued to work for the successor owner so that his "termination" was more formal than substantive and he suffered no economic loss.

For the reasons stated above, we grant the defendant's motion for summary judgment. An appropriate order will enter.