**Carol A. PUDIL, Plaintiff,**

v.

**SMART BUY, INC. and Marvin Freeman, Defendants.**

No. 84 C 7160.

United States District Court, N.D. Illinois, E.D.

April 10, 1985.

Law Office of Stuart Berks, Des Plaines, Ill., for plaintiff.

Irving M. Geslewitz, Paul E. Lehner, Adams, Fox, Adelstein & Rosen, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

Carol A. Pudil originally brought this action in state court against her former employer Smart Buy, Inc. ("Smart Buy") and its president Marvin Freeman. On August 16, 1984, the defendants, both "residents" of California, removed the action to this Court based on diversity of citizenship. Pudil's complaint advances three claims arising from her discharge on May 15, 1984. First, Pudil alleges that Smart Buy discharged her without cause or notice, in violation of the terms of her employment contract as set forth in Smart Buy's employee manual. Second, Pudil asserts that Freeman recklessly inflicted severe emotional distress upon her by directing her discharge. Third, Pudil maintains, as an alternative to her breach of contract claim, that her reasonable reliance upon the defendants' actions gives rise to a promissory estoppel. After taking discovery, including Pudil's deposition, the defendants have moved for summary judgment on all counts.

### FACTS

The facts surrounding Pudil's employment and discharge are not in dispute. In 1969, Freeman opened his first "optical boutique" under the trade name Optica. Due to the success of his concept of expensive, high quality "fashion eyewear," Freeman opened a Chicago location in late 1983. He traveled to Chicago prior to its opening to interview candidates for sales positions in his Chicago store.

Pudil successfully interviewed with Freeman during his visit. During the course of this interview, Pudil told Freeman that she was in the process of divorce, so that she would be the financial head of her house-

hold. Pudil also told Freeman that she would be leaving a position that she had held for seven years to go to work for Optica. Pudil had previously taken a leave of absence from that job to accept a higher paying position. She did not tell Freeman of this other position. In response, Freeman informed Pudil that after a 90-day probationary period, she would be given an increase in pay and become eligible for medical coverage.

Pudil began working at the Chicago Optica store on November 16, 1983. In either late December, 1983 or early January, 1984, all employees of the Optica Chicago store met with the store manager. At this meeting, the store manager presented Optica's employee manual to the employees by reading the full text of the eight-page document to them and requiring each employee to sign and return a half-page acknowledgement that he or she had received, read and understood the document. The manual contained: (i) a statement of the history of Optica; (ii) instructions to employees on proper dress, courtesy to customers and attendance; (iii) a statement of health, vacation and eyeglass benefits available to employees and promotion policy, and (iv) a list of those "offenses" that would result in immediate discharge and those that would result in discharge "after written notice."

During the course of her employment at Optica, Pudil purchased a new car (trading in her old car) and finalized her divorce (thereby losing health insurance under her ex-husband's policy). She also "altered her lifestyle in conformance with her increased earnings." Approximately ninety days after Pudil began work at Optica, she received a note from Freeman congratulating her on the quality of her work, informing her that her current paycheck included an increase in pay and expressing the hope that "you'll be with us for a long time."

On May 15, 1984, Optica's Chicago store manager informed Pudil that she was discharged, effective immediately. Optica's assistant store manager offered to help Pudil find a new job and Optica paid Pudil a severance allowance at the time of her termination. Although Pudil asked the reason for her discharge, Optica refused to give any reason. Pudil was distressed by the loss of her job at Optica and consulted her personal doctor, who prescribed tranquilizers.

## DISCUSSION

### 1. Breach of Contract

■ Pudil concedes that, under Illinois law, a written or oral employment contract which does not specify the duration of employment creates an employment "at-will" relationship, terminable by either party at any time, with or without cause. *See, e.g., Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1290–92 (N.D.Ill.1983); *Goodman v. Board of Trustees*, 511 F.Supp. 602, 606 (N.D.Ill.1981). Since Pudil does not contend that her original engagement to work at Optica's Chicago store specified any duration, she must be viewed as an employee "at-will." Nonetheless, she maintains that the employee manual, distributed after she began her work at Optica, either modified her original engagement or should be read in interpreting that agreement.

The Illinois Supreme Court has yet to pass on the effect of an employee manual upon the employer's discretion to terminate "at-will" employees. Therefore, this Court must attempt to predict the path the Illinois Supreme Court would follow. *In re Air Crash Disaster*, 701 F.2d 1189, 1197 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983); *Roberts v. Western-Southern Life Ins. Co.*, 568 F.Supp. 536, 540 (N.D.Ill.1983). In predicting how the Illinois Supreme Court would decide this issue, the decisions of the Illinois Appellate Court, *id.*, and decisions from other jurisdictions, *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200, 1202 (7th Cir.1984), are helpful indicators.

Illinois case law on this issue begins with *Carter v. Kaskaskia Community Action Agency*, 24 Ill.App.3d 1056, 322 N.E.2d 574 (5th Dist.1974). In *Carter*, the state court

found that an employer must abide by the grievance procedures set forth in its personnel policy manual where the manual contained provisions which created mutual obligations for the employer and its employees and the employee assented to the manual as a modification of his employment relation. Subsequently, *Sargent v. Illinois Institute of Technology*, 78 Ill. App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1st Dist.1979) gave a narrow reading to *Carter*, holding that since the personnel manual was given to the employee when he began his employment and contained no provisions imposing conditions on him beyond his required duties, the manual was not "bargained for" and so unenforceable. More recently another appellate court applied *Carter* to require a county board to honor its sheriff's announcement to his deputies that they would receive a raise. *Scutt v. LaSalle County Board*, 97 Ill. App.3d 181, 53 Ill.Dec. 21, 423 N.E.2d 213 (3rd Dist.1981).

Relying on the decision in *Sargent*, two published opinions in this district and additional unpublished opinions, *e.g., Brundage v. Trans World Airlines, Inc.*, No. 80 C 6701, slip op. at 7–9 (N.D.Ill. March 29, 1984) (Hart, J.), have determined that the provisions of personnel manuals do not bind employers. In *Rynar v. Ciba-Geigy Corp.*, 560 F.Supp. 619 (N.D.Ill.1983), Judge Will found that although the manual contained terms suggesting a mutuality of obligation, the employees had not assented to the modification because they were only generally aware of its existence but had not reviewed or approved its specific provisions. Citing *Rynar*, Judge Bua later found that a manual provided to the employee at the time she was hired did not bind the employer. *Enis v. Continental Illinois National Bank & Trust*, 582 F.Supp. 876 (N.D.Ill.1984). *See also Brundage, supra.*

However, in a subsequent decision, yet another Illinois Appellate Court has considered the issue, rejecting the narrow reading given *Carter* by *Sargent*. *Kaiser v. Dixon*, 127 Ill.App.3d 251, 82 Ill.Dec. 275, 283–85, 468 N.E.2d 822, 830–32 (2nd Dist.1984). *Kaiser* carefully noted the split of authority on this issue in other jurisdictions, but found the "better reasoned approach" to be to "bind the employer to the terms in its policy manual" whenever the manual "imposes obligations on both the employee and the employer," regardless of whether the manual was "bargained for." *Id. See also Brooks v. Trans World Airlines, Inc.*, 574 F.Supp. 805, 809 n. 1 and 2 (D.Col.1983) (listing additional state authorities from other jurisdictions on each side of this issue).

This Court need not decide how the Illinois Supreme Court would resolve the dispute between *Kaiser* and prior decisions as to the requisite level of employee assent to a modification of the employment relation proposed by the employer through a personnel manual. Pudil and the other Chicago employees of Optica assented to the manual as required by *Carter, Sargent, Rynar* and *Enis*. Taken together, the special meeting called by management, the formal reading of the full text of the manual and the employees' signing and return of acknowledgements that they understood the manual demonstrate assent.

As to the requisite level of mutuality, this Court must agree with the decision in *Kaiser* that where the manual imposes obligations on both employer and employee, the employer is bound by the manual. The approach taken in *Kaiser* is more consistent with the Illinois Supreme Court's approach to mutuality in other contractual situations, *e.g., S.J. Groves & Sons Co. v. State of Illinois*, 93 Ill.2d 397, 67 Ill.Dec. 92, 95, 444 N.E.2d 131, 134 (1981) (mutuality is only a requirement that both parties are bound in some way by an agreement and is satisfied by consideration), than is the "bargained for" analysis of *Sargent*. Here, as in *Kaiser*, the manual contains provisions "governing employee evaluation [p. 8], employee conduct, work habits and attitudes [pp. 1, 3, 4], holiday, sick leave, time off and vacation policies [pp. 1, 2, 5], .... discipline ... and dismissal procedures [pp. 6, 7]." Although Opti-

ca's manual is not nearly as detailed as the eighty-three page manual dealt with in *Kaiser*, Optica's manual contained provisions covering many of the same subject areas. Taken together with Optica's continuing policy of a 90-day probationary period, the manual evidences a sufficient mutuality of obligation. Hence, the defendants' motion for summary judgment must be denied as to Count I.

### 2. Infliction of Emotional Harm

■ Next, Pudil asserts that Freeman's actions in terminating her with knowledge that she would rely on his representations of job security constitute reckless or intentional infliction of emotional distress. To prevail on a claim of infliction of emotional distress, Pudil must demonstrate that the defendants' "extreme and outrageous" conduct caused her "severe" emotional distress, and that the defendants acted either intentionally to cause such distress or with knowledge of facts that would indicate such distress was substantially certain to result from their actions; i.e., recklessly. *Stoecklein v. Illinois Tool Works*, 589 F.Supp. 139, 144–5 (N.D.Ill.1984); *Heying v. Simonaitis*, 126 Ill.App.3d 157, 81 Ill. Dec. 335, 341, 466 N.E.2d 1137, 1143 (1st Dist.1984).

■ Especially in cases where the plaintiff's emotional distress has arisen during the course of employment or upon its termination, Illinois law strictly demands a showing of "extreme and outrageous" behavior. *See, e.g., Stoecklein, supra* at n. 9 (employer's alleged conduct of demoting then later forcing employee into retirement because of his age, then reneging on promise of severance pay and job counseling not sufficiently outrageous); *Balark v. Ethicon, Inc.*, 575 F.Supp. 1227, 1230–32 (N.D.Ill.1983) (employer's alleged refusal to reinstate employee despite arbitration award in his favor together with allegedly baseless referral of his name to FBI for investigation not extreme and outrageous); *Witkowski v. St. Anne's Hospital*, 113 Ill.App.3d 745, 69 Ill.Dec. 581, 447 N.E.2d 1016 (1st Dist.1983) (employer's al-

leged discharge for employee solely due to her eligibility for disability benefits together with employer's allegedly false charges of misconduct made to justify discharge not sufficiently outrageous). *See also Morrison v. Sandell*, 112 Ill.App.3d 1057, 68 Ill.Dec. 556, 446 N.E.2d 290 (4th Dist. 1983) (co-worker's conduct); *Plocar v. Dunkin's Donuts of America, Inc.*, 103 Ill.App.3d 740, 59 Ill.Dec. 418, 431 N.E.2d 1175 (1st Dist.1981) (franchiser's conduct). Neither the conduct complained of by Pudil nor the injury suffered by her is sufficiently distinguishable from that alleged in the cited decisions to avoid dismissal. The defendants' motion must be granted as to Count II.

### 3. Promissory Estoppel

■ Pudil's final claim is that the defendants are estopped by their course of conduct (Freeman's alleged representations at the job interview, the distribution of the personnel manual and the notification that Pudil had successfully completed her probationary period) from refusing to continue her employment. Pudil concedes that in order to establish promissory estoppel under Illinois law she must show: (1) a promise; (2) which should reasonably have been expected by the promissor to induce substantial action or forebearances by her; (3) which induced such action or forebearance; and (4) which must be enforced to avoid injustice. *Kulins v. Malco*, 121 Ill.App.3d 520, 76 Ill.Dec. 903, 910, 459 N.E.2d 1038, 1045 (1st Dist.1984).

The defendants argue that the record fails to reveal an unambiguous promise to Pudil. *See Rynar*, 560 F.Supp. at 625–26; *Dale v. Groebe & Co.*, 103 Ill.App.3d 649, 59 Ill.Dec. 350, 354, 431 N.E.2d 1107, 1111 (1st Dist.1981). In response, Pudil contends that such an unambiguous promise may be found in the "totality of circumstances" here, including the defendants' conduct, citing *Hoos v. Hoos*, 86 Ill.App.3d 817, 42 Ill.Dec. 174, 180, 408 N.E.2d 752, 758 (1st Dist.1980). This issue need not be decided.

　Accepting Pudil's position that she has shown a sufficiently unambiguous promise, she has failed to present evidence of sufficient harm resulting from her reliance on this promise. Pudil asserts that she (1) traded in her six-year old car for a new one, incurring a debt; (2) finalized her divorce, losing her health insurance under her former husband's health plan; and (3) "altered her lifestyle in accordance with her secured position." These actions do not constitute sufficient reliance on her part to necessitate enforcement of the defendants' "promise" so as to avoid injustice.

　"In practice, those cases which have found a change in position for the worse involved rather egregious circumstances where the [plaintiff] has acted in good faith and the [defendant] has received an unwarranted benefit." *Hoos v. Hoos,* 42 Ill.Dec. at 179, 408 N.E.2d at 757. Further, promissory estoppel permits recovery of only such damages as "are necessary to prevent injustice." *Gerson Electric Construction Co. v. Honeywell, Inc.,* 117 Ill.App.3d 309, 72 Ill.Dec. 851, 853, 453 N.E.2d 726, 728 (1st Dist.1983). These elements of a claim of promissory estoppel tend to merge; the more substantial the benefit conferred or the detriment endured, the greater the injustice that will occur absent enforcement of the promise. *See Bolden v. General Accident, Fire & Life Assurance Corp.,* 119 Ill.App.3d 263, 74 Ill.Dec. 804, 807, 456 N.E.2d 306, 309 (1st Dist.1983). Here, Pudil has not taken any action that will be for naught because of her discharge by the defendants. Her new car does not gain or lose any value by virtue of the loss of her employment at Optica. Pudil's decision to obtain a divorce (and consequent loss of her husband's insurance benefits) did not hinge upon her continued employment at Optica and the benefits she derives from her divorce are not reduced by her discharge. Hence, no injustice will result when the defendants' "promise" is not enforced.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment is granted as to Counts II and III, but is denied as to Count I. Judgment will enter on Counts II and III in favor of Smart Buy, Inc. and Marvin Freeman and against Carol A. Pudil.