**Joseph J. RIZZO, et al., Plaintiffs,**

v.

**MEANS SERVICES, INC., Defendant.**

**No. 84 C 2454.**

United States District Court,
N.D. Illinois, E.D.

March 31, 1986.

Solomon I. Hirsh and Dale D. Pierson, for plaintiffs.

Rody P. Biggert, Jeffrey K. Ross, Jill A. Goldy, Cynthia G. Swiger, Seyfarth, Shaw, Fairweather & Geraldson, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Joseph J. Rizzo ("Rizzo"), Thomas A. Grzyb ("Grzyb"), Harry D. McIntyre ("McIntyre") and William Fletcher ("Fletcher") sue their former employer, Means Services, Inc. ("Means").[1] Their Amended Complaint (the "Complaint") charges:

1. Means terminated all plaintiffs in violation of Age Discrimination in Employment Act ("ADEA") § 4(a), 29 U.S.C. § 623(a) (Count I).

2. Means' terminations of Rizzo (Count II) and Fletcher (Count III) were also racially motivated, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII") and 42 U.S.C. § 1981 ("Section 1981").

3. Means breached its employment contracts with Grzyb, McIntyre and Fletcher by laying them off and refusing to recall them in violation of an established layoff policy (Count IV, a pendent state-law claim).

Means has now moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment on all plaintiffs' claims save:

1. those in Count II (Rizzo's Title VII and Section 1981 claims;[2] and

2. part of McIntyre's Count I claim.[3]

For the reasons stated in this memorandum opinion and order Means' motion is granted as to Count IV but denied in all other respects.

### Facts [4]

#### 1. Business Background

Means provides textile rental and laundering services to commercial users (Petri-

---

1. Former Means employee Ozella Cain ("Cain"), a black female, was also originally a plaintiff. Cain's claim was voluntarily dismissed by stipulation late in 1984.

2. As to those claims, Means Mem. 25–26 concedes the existence of disputed material factual issues.

3. Means R.Mem. 32–33 concedes material fact issues exist as to the motives underlying two of the three employment decisions of which McIntyre complains.

4. Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th

Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovants—here plaintiffs. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of facts adhere to those principles. Two opening comments about the text's factual exposition must be made, the first purely mechanical but the second substantive:

1. To avoid any need for "sic" insertions, it should be understood all indented and other quotations throughout this opinion are verbatim copies of the originals.

2. This opinion is topheavy with facts and short on law. That type of imbalance can be occasioned by a number of reasons, but in this instance it reflects both (a) the need to

cig Dep. 27–28).[5] Before 1977 Means operated three Chicago-area "production facilities," where soiled rental items were cleaned for redelivery to customers (*id.* 32–25):

1. Plant 701 (the "Linen Plant"), on South Michigan Avenue, which processed linens used in restaurants;

2. Plant 730 (the "Industrial Plant"), on West Madison Street, which processed shop towels, mats, mops and some cotton garments; and

3. Plant 736 (the "Garment Plant"), on South Wentworth Avenue, which processed shirts, pants and coveralls.

During 1977 Means decided to consolidate all three plants' work at the Linen Plant location, because the Industrial and Garment Plants were "very, very antiquated" (*id.* 37) and newly enacted Chicago waste-water ordinances made a single waste-water system more economical (*id.* Ex. 3, at 5). That consolidation took place gradually, from 1977 to 1981, with the Industrial Plant closing in 1978 and the Garment Plant in 1981 (Dep. 55–57). Meanwhile a new building was added in early 1981 to the Linen Plant to accommodate increased activity there (*id.* 56). After the consolidation was complete, the South Michigan Avenue facility comprised two "plants," the Linen Plant (which incorporated the items formerly processed by the Industrial Plant) and the Garment Plant (Petricig Aff. ¶ 3).

Management of Means' Chicago operation was initially organized as follows (*id.* ¶ 6; Dep. 17):

1. Regional Manager/Operational Vice President (in charge of sales, merchandising and production);

2. Production Manager (in charge of the laundering of rental materials);

3. Plant Managers (in charge of each of the Industrial, Linen and Garment Plants) and Maintenance Managers (in charge of building upkeep and construction);

4. Shift Managers (in charge of each Plant's shifts); and

5. Production Supervisors (in charge of each shift's departments: shipping/receiving, counting, wash, flatwork, etc.).

During the period relevant to this lawsuit, E. Ronald Petricig ("Petricig," a white male) was Production Manager. Petricig had been hired in 1976, when he was 32 (Int. 3[6]), as a Project Manager—a title Means gave to new employees training for upper-management positions (Dep. 8–9, 13). Within a year Petricig was promoted to Production Manager (*id.* 15). His principal mandate was to cut costs (*id.* 50).

Though Means' Chicago operation has operated in the black since 1979 (*id.* 45–46), its total processing of textiles slipped from a high of 32.2 million pounds in 1980 to 26.7 million pounds in 1983—a 17% drop (Petricig Aff. ¶ 7).[7] During much the same period, the number of Means' salaried managers fell from 40 to 20 and the total number of persons employed in production went from 530 to 292 (*id.* ¶ 8). Salaried managers were first laid off in 1982 (Dep. 985).

In March 1982 Means was acquired by ARA Services, Inc. ("ARA") (*id.* 524). ARA had operated its own Chicago garment-cleaning plant (the "Campbell Avenue Plant"), but that plant's work was transferred to Means' Michigan Avenue operation by September 1982 (*id.* 527 A). Most Campbell Avenue Plant hourly employees

---

deal in factual terms with a host of claims (the litigants' 150 pages of briefs were similarly fact-bound) and (b) the simplicity of the legal principles that are fatal to Means' motion.

5. All further references to the Deposition of E. Ronald Petricig will simply take the form "Dep. —." Other deposition citations will follow the usual form of being preceded by the deponent's name—e.g., "J. Wright Dep. —."

6. Citations (1) to Means' answers to plaintiffs' interrogatories will take the form "Int.—" and (2) to Means' answers to plaintiffs' supplementary interrogatories, "Suppl. Int.—."

7. Actually the 1983 figure represented a partial rebound from the low point in 1982 (25.3 million pounds). Though the parties dispute the significance of the upturn, nothing in this opinion turns on the matter.

were transferred to Means' plant, but only one salaried employee, Maintenance Manager John Kinney ("Kinney"), went over (*id.* 529–32). Due to a "daily" decline in business volume, however, there was only a "temporary" increase in Means' production after the Campbell Avenue Plant merger (*id.* 528).

Means made an attempt to keep the Campbell Avenue Plant going as a hospital-laundry operation, beginning in mid-August 1982 (Petricig Aff. ¶ 19). Though some hiring was apparently done for that plant (see Dep. 1033), the project was ultimately abandoned.

*2. Rizzo*

Rizzo (then age 39, Int. 3) was hired by Petricig in May 1978 as a Second-Shift Manager (Petricig Aff. ¶ 20). Petricig knew Rizzo had prior management experience at Means[8] and thought he could help solve the company's productivity problems (Dep. 176–77). During a conversation just before Rizzo came on board, Petricig told him there was a strong possibility of advancement within a year or two (*id.* 178). Less than a year later (January 1979) Petricig promoted Rizzo to Plant Manager of the consolidated Industrial-Linen Plant (Rizzo Aff. ¶ 5). In a February 5, 1979 letter to management announcing Rizzo's promotion, Petricig wrote (Dep. Ex. 16):

> In his latest assignment as 2nd Shift Manager, Joe has brought together a group of Supervisors and has made them an effective "working team" who have contributed toward building a sounder foundation for the Chicago Production unit.

At the time Rizzo was hired as Second-Shift Manager, he was engaged to and living with Lorraine Massey ("Massey"), a black woman who is now his wife (Rizzo Aff. ¶¶ 2, 4). During their pre-employment

talks, Rizzo asked Petricig whether his relationship with Massey posed a problem at Means. Petricig said he though not but agreed to check with his own supervisor. Petricig later told Rizzo the relationship was no problem so long as Rizzo did not directly supervise Massey's work (which would violate Means' anti-nepotism policy) (Rizzo Aff. ¶ 4; Dep. 180–83).

Rizzo became "briefly estranged" from Massey in late 1980 (Rizzo Aff. ¶ 8). Though Rizzo says Petricig told him the break-up "might be the best thing for my career" (*id.*), Petricig denies making that remark (Dep. 367).[9] But Petricig does connect "some slippage" (*id:* 361) in Rizzo's performance with the break-up (*id.* 370):

> He was walking around listlessly as if he was in a daze. You talk to him and he was looking at you but he wasn't hearing what you were saying. He was gazing out. Just wasn't the same old Joe.

And though Petricig says Rizzo's performance improved "to some degree" after a reconciliation with Massey (*id.* 375), in his view Rizzo never regained his former stride. In particular, Petricig felt Rizzo's communication with his Shift Managers and Production Supervisors was poor (*id.* 375–80).

Matters worsened between Rizzo and Petricig during 1981. Both Grzyb and McIntyre say Petricig told them that fall Rizzo had no future with Means because he was engaged to a black woman (Grzyb Aff. ¶ 5; McIntyre Aff. ¶ 10). Petricig denies having made any such remarks (Dep. 508, 514).

On November 5, 1981 Rizzo wrote Petricig (*id.* Ex. 42):

> Mr. Petricig:
>
> You have expressed directly that the plant manager at the 701 facility is not attaining the required results! I have attempted to achieve all tasks asked of

---

**8.** Rizzo had been employed at Means from 1966–76 (Rizzo Aff. ¶ 3).

**9.** Petricig (Dep. 367–68) says he told Rizzo the break-up might be "the best thing" if the Rizzo-Massey conflict was the result of the couple's conflict over whether or not to get married (*id.*):

because obviously he couldn't continue in a relationship where she wanted to get married and he didn't want to get married. It had nothing to do with his career.

me and utilize my experience and ability to effectively upgrade the plant. I have been graded ineffectual, consequently, I think my services cannot benefit the team at plant 701.

If, in your estimation, I can be of some value in another area within the Means Organization, I would like to be considered as an applicant.

Respectfully,

/s/ Joseph J. Rizzo

Joseph J. Rizzo

According to Petricig Dep. 518, he did not "specifically" grade Rizzo "ineffectual"— that was "[Rizzo's] term." In fact Petricig gave Rizzo a slightly higher performance evaluation in 1982 than he had in 1981 (*id.* 544–45), but he still thought Rizzo's performance inconsistent and his chances for promotion "remote" (*id.* 548).

On December 10, 1982 Rizzo left the plant for good. That day's events are not disputed, but their significance is. Rizzo's February 7, 1983 letter to Means Personnel Vice President Don Nordstrom ("Nordstrom") tells the tale (Dep.Ex. 46, at 2–3):

On 12–8–82 there was a work standards meeting in Mr. Petricig's office. Attending were Mr. Jim Grainer, Industrial Engineer, Mr. Petricig, and myself. During the meeting Mr. Petricig made the following statement; "If the Wash Department doesn't show better results we are going to send a task force down their Friday 12–10–82." After the meeting Mr. Grainer asked me what Mr. Petricig meant by that statement, because results monitored by Mr. Grainer indicated that we were showing good progress in that area. I stated that I didn't know what Mr. Petricig meant.

On 12–10–82 about 7:00 a.m. Mr. Petricig and Mr. Kinney were touring through the Wash Department, Mr. Petricig, in a loud and aggressive manner told Mr. Vernon Scott, Wash Department Supervisor, and myself to create better continuity in the department and secure a better flow of work. He didn't wait for a reply and proceeded to the Flatwork Department with Mr. Kinney. I went up to the Flatwork Department about 7:30 a.m. attempting to calm down Mr. Scott. Near the tumbler department I saw Mr. Petricig, Mr. Kinney, Mr. Chad Patel, the Shift Manager, Ms. Carrie Bozeman, the Flatwork Supervisor, and a tumbler operator, communicating in a loud manner. As I approached them Mr. Petricig was yelling that I was not communicating with the production supervisors and also that I was not communicating with Mr. Kinney.

As tempers began to rise, I asked Mr. Petricig how he determined that I was not communicating, and he yelled back, that Mr. Kinney said I did not communicate with him regarding the maintenance problems. After hearing that comment I called Mr. Kinney a liar and stated instances of my attempting to communicate with him and receiving unconcerned, ignored, and in some cases responces as "I'm not going to hold your hand." Again I was condemned by Mr. Petricig without a hearing.

All parties mentioned above were extremely angry. Before the situation became unbearable, I left the area and proceeded to the Office Managers office, Mr. Robert Lowe, to follow-up on a payroll check for a terminated employee. As I stood by the door of Mr. Lowe's office, Mr. Petricig approached me, and in a very aggressive manner, told me to get that Wash department straightened out. I turned immediately and stated that if he didn't explain what he meant that he and Mr. Kinney could run the Wash department. I was emotionally drained and hurried into my office. As soon as I entered and sat by my desk to secure some Wash department papers out of my briefcase, Mr. Petricig entered my office and shut the door. In a highly emotional and vehement manner he asked what I meant by my statement, while he continually paced back and forth in front of my desk. The situation was highly volatile. I stated I was leaving, meaning, that I needed to leave the building to cool off. He responded with "then turn in your company I.D. card

and plant keys." After he secured the badge and keys, he left my office and I left the building immediately.

Petricig's version primarily disputes the degree of his own emotional involvement. Dep. 593 says Rizzo and Kinney "were angry" but Petricig was "in the middle" between them:

> trying to make sure that there was no— that the situation didn't get out of hand.

Further Petricig denies the confrontation in Rizzo's office was "highly emotional" or "vehement." Instead Dep. 597 says:

> No. It was very—as a matter of fact, it was very calm and I think deliberate on both our parts. There is probably a high adrenalin level, but it was calm.

Petricig did not interpret Rizzo's exit as a temporary departure to "cool off" (*id.* 599). But Rizzo Aff. ¶ 12 says:

> When I left the plant on December 10, 1982, I had no intent to resign my position as plant manager. My intention was to leave to let both Petricig and me cool off, a technique used on several similar occasions in the past by various supervisors including Chad Patel, Robert Perry, Bill Fletcher and Vernon Scott, and which I considered an accepted practice at the plant. Thus, even after Petricig asked me to give him my keys and ID badge, I assumed that I would be returning. Consequently, the only thing I took with me was my brief case. I left various personal items in my office, including a clock radio, two jackets, numerous personal papers, and a stuffed animal given to me by a co-worker.

Petricig did not try to telephone Rizzo, though Rizzo apparently expected a call (Dep. Ex. 46, at 3). Finally on December 16 Rizzo phoned Petricig and asked (*id.*):

> if the door was completely closed with regard to my service with the company, or could we discuss the problem and reach an amicable conclusion.

Pointing out Christmas was just around the corner, Petricig told Rizzo he would get in touch "after the holidays" (Dep. 602).

Again Petricig did not call.[10] Rizzo finally called him January 27, 1983, and the two made a lunch date for January 31 (Dep.Ex. 46, at 4). At that lunch Petricig told Rizzo "there was no possibility of him coming back" to Means (Dep. 607). In fact he said the plant was running better in Rizzo's absence (*id.* 613).

Meanwhile Petricig had on December 13 prepared Rizzo's "Termination of Employment" form (Dep.Ex. 47, at 2), which reflected Rizzo was "discharged" because he "disagreed with operation instructions." Nordstrom later put a different face on Rizzo's departure, writing Means' payroll manager on February 22, 1983 (Dep.Ex. 49):

> Joe Rizzo was terminated effective December 10, 1982.
>
> During February, he approached the Personnel Department and requested that his status with the Company be reviewed since he was under the impression that there was a possibility he might be reinstated with no break in service.
>
> We have carefully reviewed the circumstances which led to his termination on December 10, 1982. It appears that there is confusion as to whether Joe Rizzo voluntarily resigned at that time or whether Ron Petricig, his immediate manager, discharged him.
>
> Effective December 10, 1982, the Company made the decision to combine the position of Plant Manager which had been held by Mr. Rizzo with the position of Plant Manager which was held by another individual. Due to the consolidation of two plants almost a year ago, the remaining plant had two different Plant Managers. Hence, it was appropriate for the Company to eliminate one of the Plant Manager positions and leave only one Plant Manager position.
>
> Please change the termination records of Joseph J. Rizzo to indicate that his termination was due to "position eliminated." Please inform the Division of Unemployment Insurance regarding this change

10. Petricig (Dep. 605) says he had bronchitis after the holidays and was unable to call.

and indicate to them that the Company is withdrawing any objections to a favorable determination for Mr. Rizzo.

Initially Petricig took over most of Rizzo's responsibilities himself, giving some tasks to Garment Plant Manager John Wright ("J. Wright") (Dep. 614). J. Wright (at age 36, Int. 3) became the lone Plant Manager of Means' combined Garment-Linen-Industrial operation "around" the end of 1982 (J. Wright Dep. 14).

### 3. Grzyb

Grzyb (then age 40, Int. 3) was hired by Petricig in September 1981 as a Production Manager trainee or Project Manager—interchangeable terms (Dep. 1154). During April of that year Petricig had been told he would be promoted to Regional Manager by year-end (Petricig Aff. ¶ 13), and he was instructed to advertise for a Production Manager (Dep. 1130–31). Grzyb answered such a blind advertisement in the Chicago Tribune (Grzyb Aff. ¶ 2). He says the "deciding factor" in his decision to take the job was Petricig's representation (id. ¶ 3):

> that Means was a good, stable company that treated its employees fairly; that it retained good and qualified employees; and that I did not have to worry about layoffs and could expect to work there for a long time.

Grzyb reported directly to Petricig and was assigned to various "desk jobs" (Petricig Aff. ¶ 14). After a few weeks of that, Petricig reassigned Grzyb to "the floor" so he could get more production-line experience (id.).

ARA's March 1982 acquisition of Means "froze" Petricig's anticipated promotion (Petricig Aff. ¶ 15). Thus Grzyb had no prospect of moving into Petricig's Production Manager job, and Petricig reassigned him as a Shift Manager, but without a cut in pay to the normal Shift Manager compensation (id.).

Rizzo—as Petricig's direct subordinate—was also potentially a candidate for Petricig's job before the ARA freeze. In fact, before Grzyb was hired Petricig thought Rizzo had the "upper hand" among potential candidates (Dep. 398). Once Grzyb moved into a position under Rizzo, Petricig "sensed" friction between Rizzo and Grzyb (id. 1221). Rizzo had been critical of Grzyb's written work, calling him a "functional illiterate" (id. 1191). Grzyb's work, in Petricig's own view, fell considerably in quality (id. 1222):

> He lacked initiative, his appearance was slovenly, he did not maintain housekeeping in his area and he was not cooperative with others.

Rizzo complained to Petricig about Grzyb's performance "on a weekly basis" (id. 1232).

Grzyb was not happy in the Shift Manager job, feeling it was "not what I was hired for" (Grzyb Dep. 111). Though he says he did not complain to anyone, he felt the job was beneath his capability (id.). He did tell Petricig he no longer wanted to advance within Means' Chicago operation because Chicago was "unmanageable" (Dep. 1239). Further, on his annual evaluation form for 1982, Grzyb listed a number of positions (Production Manager, Plant Manager, Plant Engineer, Operations Vice President and General Manager) he hoped to attain within the Means organization in a year or three years,[11] but after each title he wrote "not in Chi[cago]" (Dep.Ex. 106).

On September 24, 1982—the same day he gave Grzyb an "acceptable" performance evaluation (Dep. 1236)—Petricig laid Grzyb off, citing "economic reasons" (id. 1239–40) or "economic conditions" (Grzyb Aff. ¶ 7). At that time Grzyb was the least senior supervisory employee on the staff (Grzyb Dep. 99), and it did not occur to him that the layoff "had anything to do with" his age (Grzyb Aff. ¶ 7). As far as Petricig was concerned, there was simply no place for Grzyb to go (Dep. 1243).

---

**11.** Means' annual evaluation process, which took place in September, required employees to list jobs for which they expected to be considered within one year and three years. Then their evaluating supervisors rated their performance potential for those jobs. Dep.Ex. 106 provides an example.

No one was hired to fill Grzyb's position: There was no longer a need for a Production Manager trainee/Project Manager, and Grzyb's Shift Manager responsibilities were consolidated with those of Shift Manager Tom Voss ("Voss") (*id.* 1242), who was four years older than Grzyb and had been at Means since 1966 (Int. 3).

In January 1983 29-year-old (Int. 3) Shift Manager Chuck Wright ("C. Wright") quit, leaving a Garment Plant vacancy (Dep. 1274, 1280). Grzyb Aff. ¶ 8 says he immediately phoned J. Wright about the vacancy and was told Means had not yet decided whether to retain or eliminate the position. J. Wright (at his Dep. 73) denies ever discussing the subject with Grzyb. In short order J. Wright hired 32-year-old Jim Thompson ("Thompson") to take C. Wright's old job (J. Wright Dep. 68). He says he had "no reason" to consider Grzyb (*id.* 72). And though Petricig says he left the decision in J. Wright's hands (Dep. 1281), he also says he would not have considered Grzyb in any case (*id.* 1283):

Because, No. 1, he expressly told me he was unhappy in that particular job; and, No. 2, I felt his area of expertise was more in the administrative and not on the line operation; and, No. 3, he was hired as a plant manager and not as a shift manager.

Weighing favorably on Thompson's side was his "production and mechanical background" acquired while working at Mars Candy Company (J. Wright Dep. 72).

On January 18, 1983 Grzyb filled out a "Post Separation Survey" provided by Means (Grzyb Dep. Ex. 8). That form reflects a great deal of dissatisfaction with his treatment and, in particular, with Petricig. Grzyb said his career was "irrevocably damaged" by Means' failure to promote him to Production Manager (*id.* at 1). He characterized his job as "petty clarical functions of a high school level of responsibilities" (*id.*). In response to Means' request for suggestions as to ways of im-

proving company procedures, Grzyb wrote (*id.* at 2):

Yes. Transfer the Production Mgr. out. And put in a qualified Mgr. who will operate the co in a Business Manner to provide a steady growth and profit.

Grzyb rated Petricig uniformly "poor" as a supervisor, while he rated Rizzo as "excellent" throughout (*id.*). And finally, Grzyb offered the following general comments (*id.* at 2–3):

Working Conditions are very poor, due to constant ridiculing of management in a manner that is not condusive to good management practices. Will dilibritly cause internal conflicts between department's and will observe what will happen, it appears to be a game to Ron Petricig not a place of business.

\*   \*   \*   \*   \*   \*

Would not recommend employment at the 701 location under the present management because the Production Manager is not qualified and not able to manage by objective, and constantly use excuse, but not really analizing the true problems.

That, however, was not the last chapter in the Grzyb-Means relationship. In October 1983 Grzyb sent in a resume in response to a blind newspaper advertisement for a supervisor (J. Wright Aff. ¶ 6). Though J. Wright was inclined to recommend against hiring Grzyb because he was "overqualified" for a line supervisory position (J. Wright Dep. 103), he says Petricig believed Grzyb should get the job (*id.* 105). When J. Wright offered Grzyb the job, Grzyb took it instantly (Grzyb Dep. 166).

But that second round of employment did not last long. Another reorganization came in January 1984, and Grzyb was "bumped" by 52-year-old Theodore Giersbach ("Giersbach"), a 12-year Means veteran (J. Wright Aff. ¶ 7).[12]

12. Giersbach himself was "bumped" a month later by 59-year-old John Marino, a 20-year

Means employee (J. Wright Aff. ¶ 7).

#### 4. McIntyre

McIntyre had worked with Rizzo at another laundry company. In July 1981 Rizzo called him to ask if he would interview for the Means Maintenance Manager position (McIntyre Aff. ¶ 2).

No vacancy existed at that time. Petricig said he was "being pressured by his superiors" to fire Maintenance Manager Rick Nelson ("Nelson") (id. ¶ 3), and Petricig hired McIntyre as his potential replacement (Dep. 748). McIntyre was 51 years old when hired (Int. 3) and was the only applicant interviewed (Dep. 753). According to McIntyre, Petricig said he didn't want to fire Nelson right away, because Nelson was a young man with a family.

Petricig proposed a six to eight month timetable for phasing McIntyre into Nelson's job (Dep. 755). During his first three months at Means, McIntyre shared Maintenance Manager responsibilities with Nelson, though Nelson resisted giving up authority (McIntyre Aff. ¶ 9). By the end of 1981 McIntyre had become the de facto Maintenance Manager, but Petricig did not officially give him the title until April 1, 1982, seven months after he started at Means (Dep. 803; McIntyre Aff. ¶ 11).

Petricig describes McIntyre's performance as of April 1982 as "on the low end of acceptable," his principal fault being too great a tendency to want to spend money to solve problems (Dep. 834–35). But Petricig did give McIntyre a 5% raise and told him to keep up the good work (McIntyre Aff. ¶ 11).

In June 1982 Petricig restored Nelson as Maintenance Manager and moved McIntyre to Second-Shift Supervisor (id. ¶ 12; Dep. 906). McIntyre says Petricig told him the move reflected Petricig's continuing concern for "young man" Nelson and his family (McIntyre Aff. ¶ 12). He also says Petricig denied the move reflected badly on McIntyre's work, which Petricig characterized as "excellent" (id.). Petricig denies saying that (Dep. 960) and adds McIntyre's performance as Maintenance Manager was the subject of considerable criticism (Dep. 907–09).

McIntyre's performance as Second-Shift Supervisor was strongly faulted by Nelson, once again his supervisor (see Dep.Ex. 79, an August 1982 memorandum from Nelson to Petricig detailing instances of McIntyre's "so-what" attitude toward his work). Petricig says he shared Nelson's assessment (Dep. 958). McIntyre responded to Nelson's evaluation with a four-page, single-spaced typewritten memorandum, noting in particular the fact Nelson may have considered him a threat (Dep.Ex. 80, at 4).

Petricig laid McIntyre off September 24, 1982. He told McIntyre a potential Maintenance Manager position at the projected hospital-laundry operation at the Campbell Avenue Plant was not going to materialize, and current business did not justify keeping McIntyre on the payroll (Dep. 962). Petricig claims he said nothing to McIntyre about the quality of his work (id.), but McIntyre claims Petricig said "Your work is very good" and told him "company politics" was behind the layoff (McIntyre Aff. ¶ 16). In addition, McIntyre says Petricig told him Nelson's position was shaky, intimating there was a good possibility McIntyre would be recalled "in a month or two" (id.). Petricig denies all that (Dep. 962–63).

When he was laid off, McIntyre (along with Grzyb, whose layoff came on the same day) was one of the most recently-hired managers in the plant. Not laid off was First-Shift Supervisor Charles Montgomery ("Montgomery"), a 47-year-old white who had 1½ more years at Means than McIntyre (Int. 3; Petricig Aff. ¶ 40). Montgomery assumed McIntyre's duties (Dep. 1021).

Nelson did "resign" a week after McIntyre's departure (Int. 3), although Petricig suggests (Aff. ¶ 39) he was about to lay Nelson off in any event. In fact Petricig already knew Nelson was on the way out when he laid McIntyre off, but he still saw no future for McIntyre as Maintenance Manager because he didn't think McIntyre could handle the job (Dep. 1041). Nor did Petricig consider offering Nelson's job to Grzyb, assuming Grzyb did not want to stay in Chicago (id. 1042).

Nelson was replaced in October 1982 by 33-year-old John Kinney ("Kinney"), who had come highly recommended from ARA (*id.* 1055). In November 1982 Kinney hired 27-year-old Mike Slisz ("Slisz") to oversee maintenance and installation of a liquid-supply system on the second shift. That, says Petricig, was primarily a construction job and was not the same position McIntyre had held (*id.* 1099–1103). Kinney says he did not consider McIntyre for Slisz' position because he had the impression McIntyre had been discharged for poor performance (Kinney Aff. ¶ 8).

### 5. *Fletcher*

Fletcher, the only remaining black plaintiff,[13] was hired March 24, 1980 at age 44 (Int. 3; Dep. 663). Like Rizzo, he had worked at Means during the 1970s, when he had risen as high as Shift Manager (Fletcher Aff. ¶ 2). Petricig had determined there was a need for more supervision of the hourly employees, and Rizzo recommended Fletcher for the job (Dep. 664). Rizzo's recommendation was the decisive factor as far as Petricig was concerned (*id.* 671), and Fletcher was hired as a Production Supervisor in the Industrial Plant.

Petricig relied on Plant Manager Rizzo to gauge Fletcher's performance, and he had no complaints about Fletcher's work during 1980 (*id.* 690–91). But though Rizzo's 1981 annual evaluation of Fletcher's work was "acceptable" (Rizzo Aff. ¶ 7; Dep. Ex. 58), Petricig countermanded that evaluation and downgraded it to "fair-minus" (*id.*). He felt Fletcher was not completing each day's work and was allowing dirty textiles to pile up for several days, and in general he felt Fletcher required "repetitive instructions" and more supervision than a Production Supervisor should have needed (Dep. 695–97). Nevertheless Petricig had no intention of firing Fletcher as of October 1981 (*id.* 699).

Fletcher's performance improved slightly during 1982: Rizzo rated him "fair-plus" (see Dep. Ex. 63), and Petricig let that

stand. But Rizzo Aff. ¶ 7 says he gave Fletcher the low rating only because he did not think Petricig would approve anything higher. Petricig concedes some of Fletcher's problems may have been due to maintenance breakdowns beyond his control (Dep. 725).

In February 1983 Petricig and J. Wright determined there was not enough work in the Industrial Plant to justify two shifts of supervision (Petricig Aff. ¶ 49). They decided to use one split-shift supervisor, meaning either First-Shift Supervisor Fletcher or Second-Shift Supervisor Son Quach ("Quach") (who was 44 years old, Int. 3) had to go. Quach, who had been with Means since 1975 (Int. 3) and whose work Petricig felt was better than Fletcher's, was selected as the retainee (Petricig Aff. ¶ 49).

Petricig did not recommend Fletcher for any later Production Supervisor vacancies "because of Fletcher's previous poor performance record" (*id.* ¶ 50). No one at Means ever let Fletcher know of vacancies he might fill (Fletcher Aff. ¶ 6). At least one supervisor with less seniority than Fletcher, 25-year-old Washroom Supervisor Barry Jones, a black male, was retained when Fletcher was laid off (Suppl. Int. 3).

### 6. *Management Attitudes*

Plaintiffs claim Petricig and other Means managers betrayed hostility toward older and black employees. This opinion will first review evidence bearing on the age issue, then turn to race-related evidence.

On the former subject, for example, Rizzo Aff. ¶ 11 says:

> On various occasions during 1982, while Petricig and I were touring the plant, Petricig would notice a particular hourly employee and comment that the person was moving too slow, was too old, and should be retired, or words to that effect. Such employees included Lucious Spellers and M.T. Thomas.

---

**13.** See n. 1.

And McIntyre Aff. ¶ 4 recalls a 1981 meeting:

> Petricig turned to me and said "[maintenance man Bob Jones] is one of the guys you are going to have to get rid of because he is too old and don't know nothing." Petricig then began to discuss various problems he said he had with the Company's janitors, for whom I was responsible, and he said to me, "You are going to have to get rid of M.T. Thomas because he is too old."

McIntyre *id.* ¶ 6 further remembers an August 1981 meeting:

> Petricig instructed me to get rid of another maintenance man, Lucious Spellers because he was "too old." I said, "Ron, Lucious is close to retirement. He only has a couple of years to go" or words to that effect. Petricig responded, "I don't care. Get rid of him anyway."

Finally, McIntyre *id.* ¶ 8 recalls this February 1981 Petricig statement:

> I have got to lay off Al Choudhury and Ozella Cain because they are too old.[14]

Petricig's former secretary, Clematine Summerville ("Summerville"), says (Aff. ¶ 5) Petricig made "various comments" about her age throughout the time she worked at Means (she left in 1982 at age 47 (Int. 3)). Summerville Aff. ¶ 6 also says:

> Throughout my employment with the Company, I heard Mr. Petricig make numerous comments suggesting that the Company's work force was too old and that the Company needed to hire younger people. Many times these comments would be simply of a general nature, such as, "Old people should retire, they have no place in business" or "old people are too scared and should leave the business to younger people"; and "we need young people, let the young handle it." On other occasions Mr. Petricig would return to the office from the plant floor visibly angry or upset and, in an apparent reference to something which had just occurred, would comment, "That's why I want young people" or words to that effect. On other occasions, Mr. Petricig would make similar comments in reference to specific individuals including myself, George Simpson, Bill Parker, and Harry McIntyre. On various occasions Mr. Petricig would walk by my desk and notice that I was typing a document for one of the three men identified above, and would say "He's gotta go—he's too old," or words to that effect.

Finally Summerville offers a copy of a "Region 511 1981 Processing Action Plans" memorandum she typed for Petricig from his manuscript. That memorandum (Summerville Suppl. Aff. Ex. 4, at 2) says:[15]

> Approximately 20% of the production employees are over 55 years old and represent a fairly stable and experienced work force. Productivity has always been a problem for this group as they are an inflexible group who attitudes and work habits are difficult to change. Productivity is higher from less senior people, however, the turnover rate for the junior people is higher, particularly on second shift.
>
> The maintenance group's most senior employee has over 20 years service with the junior person being hired in 1977. The skill level of the 23 men is exceptionally low for a maintenance group, with perhaps three or four that can be classified as skilled. The remainder of the men have poor work habits, little or no trouble shooting skills and have learned what they do know primarily by rote. We recognize that this condition must change dramatically and have taken steps to do so.

As to J. Wright's attitude toward age, McIntyre Aff. ¶ 7 says J. Wright told him

---

14. Shift Manager Al Choudhury ("Choudhury") and Production Supervisor Cain were both laid off in April 1982. Choudhury, an Oriental male, was 48 at that time, with 15 years at Means. Cain, a black female, was 45, with 21 years at Means (Int. 3).

15. Means R.Mem. 10 seeks to minimize the significance, but does not challenge the authenticity, of the memorandum.

in August 1981 and at least twice thereafter that Means "had a lot of old people working there" and "needed younger people or new blood." Montgomery, the First-Shift Supervisor who assumed McIntyre's duties in late 1982, was transferred to the second shift against his wishes because, he says (Montgomery Dep. 32, 36), both J. Wright and Kinney told him they wanted the younger Slisz to work days.

As for race-oriented evidence, plaintiffs also cite a number of alleged statements and incidents said to reflect racial animus. Fletcher Aff. ¶ 4 says Petricig frequently threw temper tantrums on the floor:

yelling, kicking the baskets used to haul laundry around the plant, throwing laundry out of those baskets onto the floor and then ordering supervisors such as myself to pick it up.

But Fletcher says Petricig did this only to black supervisors.[16] Black Production Supervisor Robert Perry (Dep. 55–62) confirms Fletcher's story.

Summerville Aff. ¶ 3 says Petricig greeted her during her first or second week at Means with the remark:

You know, Means has never had a black marketing center secretary, and if it's the last thing I do I'm going to get rid of you.

Petricig did not immediately make good on that alleged threat,[17] but Summerville Aff. ¶ 4 says it was not an isolated incident: On at least one other occasion in 1977 Petricig allegedly called her a "smart-ass nigger bitch."

Most Means Production Supervisors were black. Of ten such supervisors listed in Int. 3, eight were black. But above that level, hardly any blacks were in Means' management: Int. 3 shows one of six Shift Managers was black, and it lists no black Plant Managers, Production Managers, Maintenance Managers or Maintenance Supervisors.

### 7. Layoff Procedures

In January 1982 Nordstrom issued Section 816.01 of Means' Corporate Policy Manual (the "Layoff Policy") (Nordstrom Aff. ¶ 3), including the following provisions (Dep. Ex. 83, at 1):

2.0 REASONS FOR LAYOFF

Layoff of employees may be due to:

2.01 Lack of work for one week or more. (Layoff Code 11)

2.02 Job eliminated or discontinued. (Layoff Code 13)

2.03 Reduction in the work force. (Layoff Code 14)

2.04 Plant, branch or office closing. (Layoff Code 15)

3.0 SELECTION FOR LAYOFF

3.01 Hourly Employees.

Company seniority shall generally be used in the selection of non-union hourly employees for layoff and recall with due consideration being given to skill, ability, knowledge, qualifications, efficiency, and job performance as they relate to previous jobs and to the remaining jobs.

3.02 Salaried Employees

Skill, ability, knowledge, qualifications, efficiency and job performance as they relate to previous jobs and to the remaining jobs shall be used in the selection of salaried employees for layoff and recall with due consideration being given to Company seniority.

In January 1983 paragraph 2.0 was amended to add (Dep. Ex. 85, at 1):

2.05 Other than above (Layoff Code 19)

Paragraph 5.0 provides layoffs shall not exceed six months (*id.* at 2).

Means required salaried employees to sign "standard form" contracts (Dep. 993); see, e.g., Grzyb Dep. Ex. 11. That standard form is principally an agreement not to disclose Means' confidential information

---

**16.** Fletcher Aff. ¶ 5 also says Petricig once threw a metal rod at him, causing his leg to bleed. But Fletcher does not say Petricig habitually engaged in physical violence directed at black supervisors.

**17.** Summerville Aff. ¶ 8 says Petricig "discharged" her January 31, 1982, but Int. 3 says she "resigned."

and not to compete with Means after termination of employment. It also makes the employment terminable by either party on two-weeks' written notice (*id.*).

Paragraph 8.0 of the Layoff Policy provides layoffs are to be considered "terminations" for employment-contract purposes. However, that paragraph also permits payment of separation pay in lieu of the two-weeks' notice, and Petricig Dep. 982–83 says his practice was always to use the separation-pay alternative.

### Discrimination Claims

As the just-completed lengthy factual discussion suggests, the parties' principal ground of dispute is the proper interpretation of the facts surrounding the adverse employment decisions of which the several plaintiffs complain. Right off the bat that at least suggests difficulty for Means' motion, because Rule 56 calls for the grant of summary judgment only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

To prevail, then, Means must show plaintiffs have raised "no genuine issue as to any material fact" tending to show age or race discrimination. As *Backes v. Valspar Corp.*, 783 F.2d 77, 78–79 (7th Cir.1986) recently put the test:

> But at the summary judgment stage the burden of proof is on the moving party, in this case the defendant, to show that the outcome of a trial would be a foregone conclusion because with discovery complete the opposing party has turned up no evidence of an essential element of his case or defense.

Thus the first step in any Rule 56 analysis is to establish the "essential element(s)" of plaintiffs' case. Though the nature of the animus in ADEA and Title VII/Section 1983 cases differs, the essential element is the same. *LaMontagne v. American Con-*

*venience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984) teaches as to ADEA:

> The ultimate burden on a plaintiff in an age discrimination case is to prove that he was discharged because of his age. *Golomb v. Prudential Insurance Co. of America*, 688 F.2d 547, 550 (7th Cir. 1982); 29 U.S.C. § 623(a). To accomplish this, he must prove not that age was the sole factor motivating the employer to discharge him but that age was a "determining factor," in the sense that he would not have been discharged "but for" his employer's motive to discriminate against him because of his age. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979).

And with Title VII and Section 1981, "the basic inquiry is the same: Was [plaintiff] suspended for an impermissible reason of racial animus?" *Gill v. Westinghouse Electric Corp.*, 594 F.Supp. 48, 51 (N.D.Ill. 1984).

Of course the identity of the "essential element" of an employment-discrimination case must not be confused with how it is proved. Litigants appear to have become so familiar with the "prima facie case" model developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) that they tend to forget the most obvious method of proof (*LaMontagne*, 750 F.2d at 1409):

> The plaintiff may try to meet his burden directly, by presenting direct or circumstantial evidence that age was a determining factor in his discharge.

*McDonnell Douglas* and *Burdine* developed the "prima facie case" model of proof only because direct expressions (or even strongly circumstantial demonstrations) of discriminatory motivation are most often impossible to find. In these days when bias-motivated decisions present a known risk of liability, the prejudiced person is less likely to speak his or her mind. Triers of fact must perforce try to glean subjec-

tive intent from objective evidence—and most frequently of a circumstantial nature alone. As *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978) explained:

> The central focus of the inquiry in a case such as this is always whether the employer is treating "some people less favorably than others because of their race, color, religion, sex, or national origin." *Teamsters v. United States*, [431 U.S. 324] at 335 n. 15 [97 S.Ct. 1843 at 1854–55 n. 15, 52 L.Ed.2d 396 (1977)]. The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.

Thus, if an employer's act in firing an employee within a protected class and replacing him or her with an employee not in the protected class is "otherwise unexplained," discrimination may be inferred (*id.*):

> because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.

But once an explanation is forthcoming, in the form of an articulated "legitimate, nondiscriminatory reason" for the employment action, the mere inference raised by the prima facie case is rebutted and the plaintiff must then prove the defendant's stated reason was a pretext (*Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95).

■ Obviously, then, if plaintiffs have a weapon in their arsenal stronger than the mere inference created by a *McDonnell Douglas/Burdine* prima facie case, the employer's simple articulation of a legitimate, nondiscriminatory reason for adverse employment action will not send plaintiffs into full retreat. If a plaintiff has more direct evidence of a discriminatory motive than the employer's "otherwise unexplained" adverse treatment, the inquiry skips over the first two steps of the *McDonnell Douglas/Burdine* ping-pong scheme, and issue is joined directly on the question of tainted motivation.

■ Means argues earnestly it has shown legitimate, nondiscriminatory reasons for plaintiffs' layoffs and its failure to recall them: They were low on the seniority totem pole, their job performance was not up to snuff and Means was experiencing serious business cutbacks. But even if that is all true, plaintiffs accurately say they have presented evidence of race- and age-based animus in the form of statements and incidents attributable to Petricig and Wright. That is really dispositive here, for on a Rule 56 motion it is not permissible for this Court to "weigh[ ] conflicting evidence and improperly ma[k]e findings of fact which were not in the light most favorable to plaintiff" (*Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir.1985)).

*Stumph* is very much in point. There defendant's president ("Cronk") allegedly told the 55-year-old plaintiff (*id.* at 94):

> the Company was going to have to get rid of some of its older employees and get a young, aggressive organization in place for when the economy turned around.

Two months later Cronk told plaintiff his job was being eliminated because business was bad. Cronk also told plaintiff a younger employee was being retained "because of his technical background and because he was known in the industry" (*id.*). Plaintiff's only other evidence was the statements of two voluntarily-retired fellow employees who simply said they "felt" unwelcome because of their ages and so chose to retire.

That is plainly less than plaintiffs have shown here: Only one direct statement reflecting age-based animus was made in

*Stumph,* and though it was made to the plaintiff, it was not necessarily directed *at* the plaintiff when made. Instead, it was a general statement of intent. And the other two retired employees' statements amounted to no more than vague "feelings" about the defendant company's policies. Yet *Stumph* concluded (*id.* at 98) (citations omitted):

> After finding the evidence presented by plaintiff unpersuasive, the district court found that plaintiff was fired as part of the Company's work force reduction plan. The district court thus held that plaintiff failed to show that the Company's reason for his discharge was pretextual. In so holding the district court again failed to view the evidence in the light most favorable to the plaintiff. Although, as the trial court obviously believed, plaintiff may not have presented evidence upon which he would prevail at trial, plaintiff did present evidence of an intent to discriminate against older employees which could form the basis for a finding that the Company's proffered reason for plaintiff's dismissal was pretextual. Ascertaining intent in a discrimination case "is both sensitive and difficult," ... and in opposition to a motion for summary judgment a plaintiff should be required to do no more than offer proof which casts doubt upon the veracity of the employer's stated reason for its action.... Plaintiff met this burden in this case by presenting a statement by the Company's chief executive officer and two statements by co-employees which indicated an intent to discriminate.

Here plaintiffs have alleged not one but a plethora of statements by Petricig and J. Wright indicating either age- or race-based bias. On the race issue, there is also evidence blacks never made it into the upper echelons of management, though there were plenty in the lower levels to draw from. Whether a trier of fact would believe that evidence as opposed to Means' evidence is not something appropriate for this Court's consideration at the Rule 56 stage.

Indeed, Means already recognizes that truth. It has not moved for summary judgment on Rizzo's race-discrimination claims, acknowledging (Mem. 25–26) McIntyre's and Grzyb's reports of Petricig's hostility to the Rizzo-Massey interracial relationship raises a material issue of fact as to Petricig's motivation (even though at the same time Means argues Rizzo's performance was sub-par and his exit purely voluntary). In the same way, Means R.Mem. 32–33 has recognized the Summerville evidence of Petricig's statements slighting McIntyre's age (perhaps even "He's gotta go—he's too old") forecloses summary judgment "on McIntyre's failure-to-retain and failure-to-promote claims" (*id.* 33). Yet at the same time Means persists in urging the grant of summary judgment against McIntyre's other claim (based on Means' failure to recall him to a Maintenance Supervisor position).

So far as it goes, Means' candor in acknowledging factual disputes is commendable. But it suffers from myopia in its view of such disputes. It seeks to treat every employment decision as though it were a watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from (that is, irrelevant to) every other decision. In the real world, however, human beings (including triers of fact) are not compelled to reason that way. If an employer discloses an age-biased or race-biased mindset, it is certainly a permissible inference that the mindset is not focused solely on the individual employee to whom or about whom the specific statement was made. Petricig's alleged statements about "getting rid" of specific individuals because they were "too old" can be read by a factfinder as a pervasive attitude about shedding "too old" employees, just as his alleged labeling of Summerville as a "smart-ass nigger bitch" could fairly be read as a telltale clue to Petricig's motives in dealing with blacks generally (and not just Summerville). And by the same token, even decisions in which Petricig's underlings played a part could rationally be perceived as affected by Petri-

cig's disclosed discriminatory points of view.

In sum, it is not for this Court to say how a trier of fact will resolve evidence that includes—though it surely is not limited to—specific statements reflecting prohibited kinds of bias. And although other evidence of race and age discrimination may give rise to more attenuated inferences, those inferences too are—after *Stumph*—not so baseless as to require ignoring them.

That effectively disposes of all Means' contentions, with one possible exception. As to Rizzo's ADEA claim, Means does press the argument that Rizzo simply quit his job of his own free will. If that were so, there would have been no reason not to move for summary judgment on Rizzo's race-based claims as well, so Means' theory is internally inconsistent. But further, the circumstances of Rizzo's departure are themselves factual issues on which there is conflicting evidence—especially in light of Means' own internal administrative characterization of Rizzo's departure first as a termination and then as a layoff. It is flat wrong to say, as Means Mem. 24 does, "[Rizzo] cannot prove he was terminated." On the facts that is not, in *Backes* terms, a "foregone conclusion."

In the end Means has really misconstrued not the essential elements of employment discrimination cases, but rather the permissible methods of proof in such cases. Though it has articulated and offered evidence of various nondiscriminatory reasons for its actions toward plaintiffs, such articulation and evidence will not suffice for summary judgment in the face of direct evidence of discriminatory motive.[18] Issue here is joined: There must be a trial to resolve the essential intent question.

### Contract Claims[19]

Plaintiffs' contract claim is based on the Layoff Policy: They say the Layoff Policy (1) was a part of their employment contracts and (2) required Means to recall them from layoff before hiring new employees from outside. Plaintiffs survive that first hurdle, but they fall at the second.

Although until recently there had been the Illinois equivalent of a "circuit split" on the issue,[20] *Duldulao v. St. Mary of Nazareth Hospital Center*, 136 Ill.App.3d 763, 91 Ill.Dec. 470, 483 N.E.2d 956 (1st Dist. 1985) now brings the Appellate Court for the First District into line with the majority Illinois view that an employee policy manual binds the issuing employer contractually (*id.* at 765, 91 Ill.Dec. at 472, 483 N.E.2d at 958):

> when the manual imposes obligations on both the employer and employee, regardless of whether the manual was actually "bargained-for."

Nothing in *Duldulao* requires each obligation of an employer to match a corresponding employee obligation. It says only that the manual as a whole must impose obligations on both sides.

18. As might be expected, Grzyb, McIntyre and Fletcher—the laid-off employees—also controvert Means' assertions concerning their poor job performances. And they do more than merely claim they were performing adequately. They also say:

   1. as to Grzyb, Petricig had given him an "acceptable" evaluation on the very day of his layoff, citing only "economic reasons" for the action;

   2. as to McIntyre, Petricig allegedly told him directly to "keep up the good work," called his work "very good" and blamed the layoff on "company politics"; and

   3. as to Fletcher, there was obviously a dispute between Rizzo (his direct supervisor) and Petricig as to the quality of his work.

Thus here, as was not true in this Court's ruling in *Dale v. Chicago Tribune Co.*, No. 84 C 3100, slip op. at 13 (N.D.Ill. Aug. 16, 1985) [Available WESTLAW, DCTU database], cited by Means, there is indeed a question as to whether Means was really "dissatisfied" with those plaintiffs' work.

19. Only Grzyb, McIntyre and Fletcher make the Count IV contractual claim. Nonetheless, for simplicity this section of the opinion will use the term "plaintiffs" in referring to just those three.

20. See Appendix.

Thus Means R.Mem. 40–41 is wrong in saying the Layoff Policy is unenforceable contractually because it *itself* imposes no obligations on employees. Indeed that argument is itself wrong, because Layoff Policy paragraph 13.0 provides that laid-off employees must return for work on the day specified in any recall notice or they will be terminated. On a larger scale, Petricig (Dep. 78) observed the Means policy manual was an eight-volume collection of practices and procedures employees were supposed to follow. That seems to be what *Duldulao* was talking about. See also *Pudil v. Smart Buy, Inc.*, 607 F.Supp. 440, 443–44 (N.D.Ill.1985) (cited with approval in *Duldulao* ).

■ But plaintiffs' real problem is that the Layoff Policy does not in fact obligate Means to do what plaintiffs claim. Nothing is said about the order or priority of recall, or even about any entitlement to recall at all. True enough, the term "layoff" implies a separation not as final as a "discharge," but the mere use of the term creates no implied right to, or reasonable expectation of, recall.[21]

Plaintiffs might perhaps suggest (though they haven't) that if "layoff" status does *not* create a right to recall, it is an empty provision. But that argument too would fail. Nordstrom Aff. ¶¶ 7–8 tells us that layoff status (which was limited in any event to six months, after which time the laid-off employee was considered fully terminated) (1) allowed an employee to continue as a member of Means' health insurance group, thus obtaining insurance at the lower group rates, and (2) provided a seniority cushion *if* the employee were reemployed within six months. Hence the policy as drafted provided not inconsiderable benefit to laid-off employees wholly apart from any right of recall. And hence a right of

recall need not be implied to give meaning to the Layoff Provision.

### Conclusion

As to Count IV, there is no genuine issue of fact, and Means is entitled to a judgment as a matter of law. That count is dismissed. But as to each of Counts I, II and III, disputed material factual issues preclude summary judgment. Means' motion is denied as to those counts.

### Appendix

As n. 20 reflects, when briefing began on the current motion one aspect of the case involved a split of authority among the Illinois Appellate Districts. Had that division of views remained in effect, this Court would under *Erie v. Tompkins* principles have been obliged to follow the views of the First Appellate District, just as would the state Circuit Court in which the same state-law claim could have been filed (see *Abbott Laboratories v. Granite State Insurance Co.*, 573 F.Supp. 193, 195, 196–200 (N.D.Ill.1983)).

This Court is of course aware of the opinions of some of its colleagues who prefer the greater flexibility of trying to predict what the Illinois Supreme Court would do if and when faced with the same kind of conflict among Appellate Districts. And there are of course some statements in opinions by our Court of Appeals (and even one or two bits of language in United States Supreme Court opinions) supporting that predictive approach. But *not one* of those statements has dealt in terms with the situation (which may or may not be unique to Illinois) where an integral part of Illinois substantive law—which we federal judges are duty-bound to adhere to and follow under *Erie*—is a rule that mandates every Illinois trial court to follow current opinions in its own Appellate District, even

---

**21.** Plaintiffs cite *Kross v. Western Electric Co.*, 701 F.2d 1238, 1239 n. 2 (7th Cir.1983) for the proposition that "inherent in the term ['layoff'] is the anticipation of recall." But neither *Kross* itself nor *CBS, Inc. v. International Photographers of the Motion Picture Industries, Local 644, I.A.T.S.E.*, 603 F.2d 1061, 1063 (2d Cir.1979)— from which *Kross* quoted—held the term "layoff" implied an enforceable *right* of recall as distinct from its mere possibility. Indeed, in both those cases the *employer* argued it had not "discharged" the employees—triggering arbitration or ERISA rights—but had only laid them off subject to possible recall.

if it might prefer the differing views of another Appellate District (or even if it believed the Illinois Supreme Court, given the opportunity, might opt for the other District's view). *People v. Thorpe*, 52 Ill. App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977); *Garcia v. Hynes & Howes Real Estate, Inc.*, 29 Ill. App.3d 479, 482, 331 N.E.2d 634, 636 (3d Dist.1975).

Ordinarily the job of a state trial court, in the absence of controlling state supreme court precedent, is to make its best effort to decide what its supreme court would do if faced with the same problem. That task really accounts for the opinions that express a federal court's responsibilities in the same terms where state law is to provide the rule of decision. And that is so because of *Erie* itself and the very reason *why* it mandated federal courts' adherence to state substantive law. As *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945) put it:

> The nub of the policy that underlies *Erie R. Co. v. Tompkins* is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a substantially different result.

Accord, *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941):

> Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.

But the same principle that informs *Erie* and its progeny compels a wholly different approach where the duty of the state trial court is not Supreme-Court-prediction but Appellate-Court-adherence. After all, *Thorpe* and *Garcia* express at least as binding a substantive law principle in *Erie* terms as the substantive doctrines of contract or tort law we federal judges may be asked to choose between where the intermediate state courts differ. And, not so

incidentally, the *Thorpe-Garcia* rule is one as to which there is *no* split of Illinois authority and there is *no* reason to believe the Illinois Supreme Court disagrees with the rule—indeed at least as recently as 1981 that court deliberately passed up the opportunity to announce a different rule.

There is plenty of room to criticize (as unsound constitutional doctrine) *Erie*'s compelled slavish adherence to state law. But so long as *Erie* binds us, we are not free to pick and choose which established state law doctrines we want to follow and which we do not—to ignore the unequivocal *Thorpe-Garcia* choice-of-law mandate in favor of giving ourselves greater latitude in essaying to predict future Illinois Supreme Court decisions where Illinois Appellate Districts differ on rules of law. That latter approach fosters forum shopping in precisely the way *Erie* sought to eliminate: by creating the prospect of differing results for the diversity plaintiff who has a choice between filing suit in one of two Clerk of Court's Offices four blocks apart on Chicago's Dearborn Street, or for the diversity defendant who must decide whether or not to remove a case from the northernmost of those courts to the southernmost.

That last geographical illustration (and it must be understood as only an example, occasioned by the fact that most cases filed in this District Court have a Cook County nexus) suggests a brief word on the straw man raised by some of the opinions of this Court's colleagues that espouse the Supreme-Court-predictive approach. This Court's adherence to *Thorpe-Garcia* should not be misread as automatically looking to the Illinois Appellate Court for the First District just because this Court sits (in the literal physical sense) within that District. Such an approach could of course lead to exactly the same kind of forum shopping *Erie* and this Court seek to avoid. What proper analysis calls for is a two-step inquiry: First, the federal court must determine which is the proper Appellate District to look to (in a case originally filed in this District Court, that is a function of the Illinois venue provisions that would have

controlled the plaintiff's choice had the suit been filed in state court; in a removed case, the location of the state court where suit *was* filed provides the precise and obvious answer). Second, only then does the federal court ascertain the applicable state law as in force in that Appellate District (including, if relevant, the use of the *Thorpe-Garcia* rule). See, e.g., *Abbott Laboratories,* 573 F.Supp. at 195.

All of us have a tendency to exit through the same door we entered. Though this Court has sought to retain an open mind on the Supreme-Court-predictive issue (and though this Court recognizes the usual soundness of that approach for the ascertainment of state law under *Erie*), unless and until someone offers a reasoned analysis covering the special Illinois situation— an analysis that explains how federal courts in Illinois can be free to ignore *Thorpe-Garcia* and still profess adherence to *Erie*—this Court will continue to apply the principles expressed in this Appendix.