**Ray AYDT, Joseph De Frier, Dorothy Kantarski, Clifford Lloyd and Howard Yount, Plaintiffs,**

v.

**DE ANZA SANTA CRUZ MOBILE ESTATES, a California limited partnership, Defendant.**

**No. 86 C 10040.**

United States District Court, N.D. Illinois.

Feb. 24, 1989.

Mark J. Muscarello, Jeffrey Lawrence, Muscarello, Crisanti & Young, Elgin, Ill., for plaintiffs.

Timothy F. Haley, Catherine E. Carpenter, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

LEINENWEBER, District Judge.

Plaintiffs, four residents of a mobile home park in Elgin, Illinois, filed a seven-count complaint seeking declaratory and injunctive relief and damages on behalf of themselves and approximately one thousand one hundred other park residents. Defendant, De Anza Santa Cruz Mobile Estates ("De Anza"), their landlord, is a California limited partnership. At issue here is the interpretation of the Illinois Mobile Home Landlord and Tenant Act (the "Act"), Ill.Rev.Stat., ch. 80, ¶ 201 et seq. (1987). For the reasons herein stated, summary judgment is granted in favor of plaintiffs and against defendant on Counts III, IV, V, VI and VII of the amended complaint.

The relevant facts are not in dispute.[1] Commencing in 1981 defendant offered its park residents a standard form lease for terms of one, two or three years. The lease contained the following provisions:

"Upon the expiration of the original term of this lease, it shall automatically be extended for successive one year periods unless resident or De Anza notifies the other in writing not less than thirty days prior to the expiration of the original or any succeeding term that the lease will not be automatically renewed."

The lease provided for a specified monthly rental for the balance of the calendar year in which the lease began. The lease also contained the following provisions:

"Commencing January 1 of each year following that in which the lease term begins, the provisions of 'rental adjustments,' attached hereto as schedule 'A' and made a part hereof by this reference shall apply."

The relevant portion of exhibit "A" reads as follows:

---

1. Although defendant has filed a "Statement of Genuine Issues," it does not contest the truthfulness of plaintiffs' Local Rule 12 statement. The "issues" raised by defendant's statement are for the most part questions of law.

SCHEDULE "A"

Rental Adjustments

"The monthly rental set forth in paragraph 2 of the Lease is the rental for the balance of the calendar year in which this Lease is executed. At the beginning of *each* succeeding calendar year during the term of this Lease, said rental may, at the option of DE ANZA, be increased by any or all of the following factors:

A. The same proportion as the Consumer Price Index (described below) for January of the year of increase bears to the Consumer Price Index for January of the year the Lease was entered into. However, should the percentage increase in said Index exceed 10% during any single adjustment period, the rental increase during that period shall be limited to 10% plus one-half of the difference between that 10% and the rental increase that would result if the full amount of the actual percentage increase in the Index were used for the particular period. (Computations will be rounded to the nearest dollar, 50 cents rounded down, 51 cents rounded up.)

Examples:

| | | |
|---|---|---|
| Current Rent | | $200 |
| CPI of 7% | × 7% = | 14 |
| New Rent | | $214 |
| CPI 12% (10% − ½ of | | |
| 2%) × 1% | = | 22 |
| New Rent | | $222 |

The Consumer Price Index referred to above shall be the United States Department of Labor, Consumer Price Index, U.S. City Average—All Urban Consumers (1967 = 100) or successor index in effect at the time of any rental increases."

Commencing in 1983 defendant adopted a practice of sending a form letter to all residents between December 25th and 30th notifying them what their rent would be commencing January 1st of the ensuing year. Residents whose leases were not expiring during the year in which the no-

tice was sent received rent increases based on the Consumer Price Index ("CPI") formula. However residents whose leases were about to expire on December 31st were informed that in addition to the CPI increase they would be required to pay a "market rate" increase.

On April 25, 1988 this court issued a memorandum opinion and order certifying a class of all park residents who signed the 1981 version of the standard form lease with respect to Counts VI and VII of the amended complaint and sub-classes for those residents who signed leases expiring December 31, 1983, 1984 and 1986 with respects to Counts III, IV and V.[2]

Plaintiffs contend with respect to Count VII of the amended complaint that defendant was and is prohibited by section 8 of the Act from failing to renew a lease upon its expiration except for reasons of tenant misconduct; with respect to Count VI defendant was and is prohibited from charging any rental increase in new leases provided to tenants whose leases expired in 1983, 1984 and 1986 that were not clearly set forth in the expiring leases; and with respect to Counts III, IV and V defendant's notice of non-renewal sent to tenants whose leases were due to expire on December 31, 1983, 1984 and 1986 constituted insufficient notification of termination, were therefore automatically renewed, and the "market rate" rent increases proposes were illegal.

DISCUSSION

Count VII [3]

Plaintiffs contend in Count VII that defendant violated section 8 of the Act when it unilaterally terminated the 1981 leases and imposed new leases containing a "market rate" increase in rent.

Section 8 of the Act provides as follows: "Every lease of a mobile home or lot in a mobile home park shall contain an option which automatically renews the lease;

---

2. The parties have entered into a stipulation to dismiss Counts I and II of the amended complaint without prejudice and without costs.

3. The court will consider the counts in the order that the parties briefed them.

unless: (a) the tenant shall notify the owners 30 days prior to the expiration of the lease that he does not intend to renew the lease; or (b) the park owner shall notify the tenant 30 days prior to the expiration of the lease that the lease will not be renewed and *specify in writing the reasons, such as violations of park rules, health and safety codes or irregular or non-payment of rent."*

Ill.Rev.Stat., ch. 80, ¶ 208 (1987) (emphasis added). The parties disagree as to how the emphasized portion of section 8 should be interpreted. Plaintiffs argue that the three reasons for termination specified: "violations of park rules, health and safety codes, or irregular or non-payment of rent" have a common characteristic as being "tenant misconduct." Consequently, a landlord's perceived need for more money which does not involve tenant misconduct is an impermissible reason for terminating the lease. Plaintiffs analogize the words "such as" in the context that it is used in section 8 to the rule of construction *ejusdem generis.* Defendant faults plaintiffs' reliance on this maxim arguing that *ejusdem generis* only applies when the statutory clause specifically describes several classes of persons or things succeeded by the word "other" so that the "other" should be construed to be of the same type as those previously listed. Defendant argues further that *ejusdem generis* is never employed when its use would effect a purpose which is not intended by the legislature, (*Citizens Utilities Co. v. ICC*, 50 Ill. 2d 35, 40, 276 N.E.2d 330, 333 (1971)), and limiting a landlord's right to terminate a lease to tenant misconduct constitutes a form of rent control. Since the legislative record is silent on rent control it was surely not intended by the legislature. Accordingly, section 8 should be interpreted to permit a landlord to refuse to renew a lease so as to obtain a rent increase. Defendant further argues that interpreting section 8 the

way plaintiffs do renders it unconstitutional, absurd, and unreasonable.

The purpose of all rules or maxims adopted by the courts for the construction or intepretation of statutes is to discover the true intent and meaning of the law. *Lincoln Natl. Life Ins. Co. v. McCarthy,* 10 Ill.2d 489, 140 N.E.2d 687 (1957). When considering a statute which is unambiguous and which clearly expresses the intention of the General Assembly, the court must give effect to such intention. *City of Nameoki v. Granite City*, 408 Ill. 33, 95 N.E.2d 920 (1951). Effect should be given to a statute in accordance with the plain and manifest meaning of the language used in the statute even though it results in inconvenient or absurd results. *Louisville & Nashville R.R. Co. v. Industrial Bd. of Ill.*, 282 Ill. 136, 118 N.E. 483 (1917).

A meaning of the word "such" according to *Webster's Third New International Dictionary* is "of a kind or character about to be indicated, suggested, or exemplified." Thus even if it could be argued that the maxim of *ejusdem generic* is limited to specifics followed by the general, nevertheless the meaning of the word "such" in the context of section 8 is to interpret the general by the characteristics of the specifics that succeed it. Accordingly, it would appear under the plain meaning of the emphasized language in section 8 the landlord's right to refuse to renew is limited to reasons of tenant misconduct. This should be the interpretation unless the result would effect a purpose clearly not intended by the legislature. If this interpretation of section 8 mandated rent control we would give pause.[4]

Even though defendant argues and plaintiffs concede that this interpretation does make section 8 a rent control statute, a close analysis of the provisions of the Act belies this contention. Essentially section 6 of the Act requires that the park owner offer a future tenant a written lease.[5] Sec-

---

**4.** The legislative record indicates that the Mobile Home Park industry did not oppose the bill (*see* floor remarks of Rep. Griescheimer) Ill. House of Reps., May 25, 1979, ex.C *Defendant's Memorandum of Law in Opposition.* It is be-

yond belief that the industry would have not opposed rent control.

**5.** Section 6 provides:
"Obligation of Park Owner to Offer Written Lease. No person shall offer a mobile home

tion 8 (in dispute here) provides that every lease shall contain an option which automatically renews the lease except for certain reasons. Section 9 [6] (in dispute in Count VI) requires that the terms for payment of rent must be clearly set forth in the lease and cannot be changed except as provided. The Act has been interpreted by the Illinois courts as revealing the legislature's desire to protect tenants from enduring the expenses and other tribulations encountered in moving a mobile home, *Beeding v. Miller*, 167 Ill.App.3d 128, 138, 117 Ill.Dec. 707, 520 N.E.2d 1058 (2nd Dist. 1988), *appeal denied*, 122 Ill.2d 569, 125 Ill.Dec. 211, 530 N.E.2d 239 (1988), and to protect tenants from landlords who would take unfair advantage of a tenant by raising rental fees after the tenant has expended the funds by affixing a dwelling onto the rented premises. *People ex rel. Fahner v. Hedrich*, 108 Ill.App.3d 83, 95, 63 Ill.Dec. 782, 790, 438 N.E.2d 924, 932 (2nd Dist.1982).

■ The obvious intent of the Act therefore is to prevent a landlord from arbitrarily and without cause from terminating a tenant's lease and arbitrarily and without notice increasing the tenant's rent. Neither section 8 nor section 9 prohibits rental increases as such. Section 8 requires leases be automatically renewed except for cause. Section 9 of the Act prohibits rental increases which are not clearly set forth in the lease. A landlord could provide in its lease that the tenant's rent will double every year at the option of the landlord. This is hardly rent control. As long as the tenant knows up front that his rent may double every year he therefore may choose to locate at another mobile home park. Cf. *Hedrich*, 108 Ill.App.3d at 90, 63 Ill.Dec. at 787, 438 N.E.2d at 929.

Defendant contends that plaintiffs' interpretation of section 8 violates various provisions of the United States and Illinois Constitutions, specifically the due process clause guaranteed by the Fourteenth Amendment as both vague and impinging upon a fundamental interest; constitutes the taking of its property without just compensation; violates the contracts clause; and violates the equal protection clause.

Many of these arguments have been rendered moot since defendant filed its brief because the Illinois Appellate Court for the Second District directly addressed the constitutionality of section 8 in its opinion in *Beeding v. Miller, supra*.[7] In *Miller* the court declined to apply a strict scrutiny analysis and found that the legislative purpose of protecting mobile home park tenants from incurring the expenses of moving as a result of the failure of unscrupulous landlords to renew a lease was a legitimate governmental interest in that it ensures the continued availability of quality housing for persons of low to moderate means. *Miller*, 167 Ill.App.3d at 140, 117 Ill.Dec. at 715, 520 N.E.2d at 1066. The same court had previously found for equal protection purposes that the distinction between traditional landlords and the mobile home landlords is a legislative classification which is rationally related to a proper gov-

or lot for rent or sale in a mobile park home without having first exhibited to the prospective tenant or purchaser a copy of the lease applicable to the respective mobile home park.

(a) The park owner shall be required to offer to each present and future tenant a written lease for a term of not less than 12 months, unless the parties agree to a different term subject to existing leases which shall be continued pursuant to their terms.

(b) Tenants in possession on the effective date of this Act shall have 30 days after receipt of the offer for a written lease within which to accept or reject such offering; during which period, the rent may not be increased or any other terms and conditions charged, except as permitted under this Act; providing that if the tenant has not so elected he shall vacate within the 30 day period.

(c) The park owner shall notify his tenants in writing not later than 30 days after the effective date of this Act, that a written lease shall be available to the tenant and that such lease is being offered in compliance with and will conform to the requirements of this Act."

6. *See infra*, p. 197.

7. Since state court venue would be Kane County, Illinois and jurisdiction is based on diversity this court, under *Erie v. Tompkins* principles, is bound by the rulings of the Second Appellate District. *See Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115 (N.D.Ill.1986).

ernmental purpose. *Hedrich,* 108 Ill.App. 3d at 95, 63 Ill.Dec. at 790, 438 N.E.2d at 932.

The Illinois courts with regard to the contract clause arguments have held that the right to contract is qualified by the state's legitimate exercise of police power. *Miller,* 167 Ill.App.3d at 142–43, 117 Ill. Dec. at 717, 520 N.E.2d at 1068 (citing *Memorial Gardens Assn., Inc. v. Smith,* 16 Ill.2d 116, 128, 156 N.E.2d 587, *appeal dismissed,* 361 U.S. 31, 80 S.Ct. 121, 4 L.Ed.2d 98 (1959)). The state may pass legislation which affects the right to contract as long as the legislation is reasonably necessary to secure the health, safety, morals, or general welfare of the community. *Id.* The specific question presented here was presented in *Miller.* There the court said:

> "In the instant action, plaintiff states that the subject of impairment is the provision prohibiting a landlord from simply choosing not to renew a lease at its expiration. The contract in question here is the lease. The lease, executed subsequent to the statute in question, provides on its face that renewal be automatic subject to either party giving adequate notice ... [R]egardless of whether section 8 impairs the contract, we have already concluded that the state's purpose behind section 8—protecting tenants from the arbitrary termination of their tenancies—is legitimate, and the conditions imposed by section 8 are reasonable. Contrary to plaintiff's assertion, section 8 does not create a life tenancy for mobile home lot lessees. It merely requires landlords to establish cause for terminating the tenancy. [The landlord] continues to have the beneficial use of his property and may regain possession of it if he shows cause for termination. Therefore, we hold that section 8 of the Act is not an unconstitutional impairment of contract between mobile home park owners and lot lessees."

*Id.* 167 Ill.App.3d at 143, 117 Ill.Dec. at 717–18, 520 N.E.2d at 1068–69.

Defendant's final argument is that plaintiffs' interpretation of section 8 would prohibit landlords from changing the use of their park thus obligating landlords either to continue in the business of operating a mobile home park or to sell their park to another operator at a substantially reduced value. However there is no indication that defendant has any current intention or desire to change the use of its mobile home park or to sell it. Whether section 8 or other provisions of the Act could be interpreted to prevent a change in land use is therefore not before the court. Defendant is asking the court to interpret the application of a statute to a hypothetical situation that may or may not occur. "Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract inquiry for the proper exercise of the judicial function." *Intnl. Longshoremen's & Warehousemen's Union, Local 37 v. Boyd,* 347 U.S. 222, 224, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954). The court therefore declines to rule on this argument.

■ Accordingly, the court finds section 8 of the Act prohibits defendant from refusing to renew the lease of plaintiffs for reasons other than tenant misconduct. Therefore the court enters summary judgment in favor of plaintiffs and against defendant on Count VII.

### Count VI

■ Count VI of plaintiffs' complaint alleges that the "market rate" increases imposed on tenants whose leases expired on December 31, 1983, 1984 and 1986 were in violation of section 9 of the Act because they amounted to terms for payment of rent which were not clearly set forth in the leases. Section 9 of the Act provides as follows:

> "The terms for payment of rent shall be clearly set forth and all charges for services, ground or lot rent, unit rent, or any other charges shall be specifically itemized in the lease and in all billings of the tenant by the park owner.
> The owner shall not change the rental terms nor increase the cost of fees, except as provided herein ..."

198

Ill.Rev.Stat., ch. 80, ¶ 209 (1987). In *People ex rel. Fahner v. Hedrich* the court found that the specific legislative purpose of section 9 was to protect tenants from landlords who would take unfair advantage of a tenant by raising rental fees after the tenant had expended funds by affixing a dwelling under the rented premises. *Hedrich*, 108 Ill.App.3d at 95, 63 Ill.Dec. at 790, 438 N.E.2d at 932. The court also upheld the constitutionality of section 9 against due process, equal protection and vagueness arguments. *Id.* at 94–96, 63 Ill.Dec. at 790–91, 438 N.E.2d at 932–33. The court noted that had the prospective tenant been aware of the landlord's intention to impose resale fee sales commissions the tenant might have chosen to locate in another park or not to purchase or reside in a mobile home at all. *Id.* at 90, 63 Ill.Dec. at 787, 438 N.E.2d at 929. Section 9 merely requires that the owner of a mobile home park clearly advise its tenant the basis for computing rents or other costs so that the tenant will know prior to locating at the park, that three years down the road for example, that he may be in line for a hefty rental increase. The fact that this legislation may impact negatively on tenants by forcing new tenants to pick up the slack for the old tenants or by causing any of the other detriments cited by defendant is beside the point. It has never been a constitutional requirement that legislation make economic sense. *See Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir.1987).

### Counts III, IV and V

In Counts III, IV and V plaintiffs assert claims on behalf of sub-classes of tenants whose leases bore expiration dates of December 31, 1983, 1984 and 1986 respectively. These counts claim that De Anza's form letters in which "market rate" increases were imposed instead of the CPI increases violated the leases. Since the court has already ruled that the leases could only be terminated for cause in accord with section 8 we need not determine whether the notices sent by defendant to the class tenants was sufficient to inform the tenant that non-renewal was intended.

It is enough to say that the notices do not rely upon tenant misconduct as a basis for termination. Accordingly, under section 8 of the Act the leases were automatically renewed.

In addition to its arguments that the notices were adequate to terminate the leases, De Anza has interposed the defenses of merger, estoppel and waiver on Counts III, IV and V.

The merger argument is based upon the fact that most of the plaintiffs executed subsequent leases to their lots. The estoppel argument is based upon the fact that defendant materially relied upon the actions of tenants in planning the future operations of its mobile home park and therefore allowing plaintiffs to resurrect the terms of the old leases would at this time be an injustice and an imposition of financial hardship on defendant. The waiver argument is that by executing new agreements with defendant, plaintiffs have waived any right they had to an automatic renewal.

The issue however is not whether plaintiffs can waive provisions of their lease but whether they can waive defendant's obligation to abide by the Act. The law is clear on this point. It is a well accepted rule that the benefits of the statute may not be waived by an individual in cases where the statute was enacted for the protection of the public generally. *People ex rel. Lindberg v. Memorial Consult., Inc.*, 50 Ill.App.3d 1005, 1010, 9 Ill.Dec. 13, 17, 366 N.E.2d 127, 131 (3rd Dist.1977), *appeal dismissed*, 436 U.S. 952, 98 S.Ct. 3063, 57 L.Ed.2d 1118 (1978).

The defendant cannot rely upon equitable estoppel either. The party claiming the benefit of estoppel "must have relied upon the actions or representations of the other and must have had no knowledge or convenient means of knowing the true facts." *Denton Enterprises, Inc. v. Ill. State Toll Hwy. Authority*, 77 Ill.App.3d 495, 503, 32 Ill.Dec. 921, 927, 396 N.E.2d 34, 40 (1st Dist.1979) (citing *Levin v. Civil Service Commn.*, 52 Ill.2d 516, 524, 288 N.E.2d 97 (1972)). Here as in *Denton* both

of these essential elements are lacking. Defendant is charged with the knowledge of the contractual limitations which the law places upon it and its tenants. Defendant cannot rely upon a fact it is presumed to know as untrue. Accordingly, the doctrine of equitable estoppel is not applicable.

Finally, defendant's argument of merger is defeated by the terms of the Act itself. Section 201 specifically provides that "any lease, written or oral, shall be unenforceable insofar as any provision thereof conflicts with any provision of this Act." Since the provisions upon which defendant claims merger are unenforceable, there can be no merger. Accordingly, plaintiffs are entitled to summary judgment on Counts on III, IV and V of the amended complaint.

## CONCLUSION

Summary judgment is granted in favor of plaintiffs and against defendant on Counts III, IV, V, VI and VII of the amended complaint.

IT IS SO ORDERED.